UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

RECEIVED

MAY 26 2011

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Civil File No. _____

11cv 1358 DSD/JJK

Security Life Insurance Company of America,
a Minnesota corporation,

        Plaintiff,

v.

Southwest Reinsure, Inc., a New Mexico
Corporation; James B. Smith; Family Heritage
Reinsurance Co., Ltd., a corporation organized
under the laws of the Turks and Caicos Islands;
Ideal Insurance Company, Ltd., a corporation
organized under the laws of the Turks and
Caicos Islands; Sierra Family Life Reinsurance
Co., Ltd., a corporation organized under the
laws of the Turks and Caicos Islands; Libre
Insurance Co., Ltd., a corporation organized
under the laws of the Turks and Caicos Islands;
INA Trust FSB, a federally chartered savings
bank; ABC Corporation and John Does 1-10;
and XYZ Corporation and Jane Does 1-10,

        Defendants.

**VERIFIED COMPLAINT**

*Jury Trial Demanded*

Security Life Insurance Company of America, for its Complaint against Defendants Southwest Reinsure, Inc., James B. Smith, Family Heritage Reinsurance Company, Ltd., Ideal Insurance Company, Ltd., Sierra Family Life Reinsurance Company, Ltd., Libre Insurance Company, Ltd., INA Trust FSB, ABC Corporation and John Does 1-10; XYZ Corporation and Jane Does 1-10, states and alleges as follows:

SCANNED

MAY 26 2011

U.S. DISTRICT COURT/MPLS

## THE PARTIES

1.    Security Life Insurance Company of America ("Security Life") is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.

2.    Southwest Reinsure, Inc. (referred to in this Complaint as "SRI" and referred to in some documents as "SouthwestRe") is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico.

3.    James B. Smith ("Smith") is, on information and belief, the majority shareholder in SRI.  Smith is SRI's President and CEO and is a resident of the state of New Mexico.  SRI and/or Smith have been the sole representatives to Security Life as to the Defendants' actions as alleged in this Complaint.

4.    Family Heritage Reinsurance Company, Ltd. ("Family Heritage") is a corporation organized under the laws of the Turks and Caicos Islands.  Its principal place of business is in Albuquerque, New Mexico.  On information and belief, Family Heritage was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

5.    Ideal Insurance Company, Ltd. ("Ideal") is a corporation organized under the laws of the Turks and Caicos Islands.  Its principal place of business is in Albuquerque, New Mexico.  On information and belief, Ideal was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

6.    Sierra Family Life Insurance Company, Ltd. ("Sierra Family") is a corporation organized under the laws of the Turks and Caicos Islands.  Its principal place of business is in Albuquerque, New Mexico.  On information and belief, Sierra Family was organized and

administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

7.     Libre Insurance Company, Ltd. ("Libre") is a corporation organized under the laws of the Turks and Caicos Islands. Its principal place of business is in Albuquerque, New Mexico. On information and belief, Libre was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

8.     INA Trust FSB is a federally chartered savings bank with its principal place of business in Philadelphia, Pennsylvania. ABC Corporation and/or John Does 1-10 are, on information and belief, successors to INA for purposes of the allegations of this Complaint.

9.     XYZ Corporation and/or Jane Does 1-10 are, on information and belief, entities and individuals associated with Smith and SRI who are the successors to the Turks and Caicos corporations identified as Defendants in this action, have past or present ownership interests in those corporations, and/or are the alter egos of those corporations and/or SRI.

## JURISDICTION & VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is diversity between the parties and the amount in controversy exceeds $75,000.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, inasmuch as Defendants have transacted business in this District during times relevant to this action and a substantial part of the events giving rise to this action have occurred in this District.

12.     Jurisdiction and venue are also proper under various agreements between and among the parties, which provide for the application of Minnesota law, contain the agreement of

Defendants, or some of them, to be sued in any U.S. District Court, and provide for the

Minnesota Commissioner of Insurance to accept service on behalf of Defendants.

## FACTS

### *Smith and the SRI Family of Companies*

13.     SRI's website describes Smith as the founder of SRI and an "industry luminary."

SRI describes its business as follows:

> Recognized as one of the most knowledgeable organizations in the reinsurance
> arena, SouthwestRe provides the full spectrum of policy and financial
> administration for organizations that sell insurance products.   We offer
> customized insurance solutions designed to create profit opportunities for our
> clients while reducing their financial risk.   Ultimately, SouthwestRe makes it
> possible for our insurance producer clients to share in the back-end management
> profits as well as the front-end commissionable sales.

> We accomplish this through two means:  First, we create and administer insurance
> products such as automotive dealer F&I products and financial institution
> products, and second, we form and manage producer-owned reinsurance
> companies (PORCs).

> ***

> All of our innovative programs are backed by more than 20 solid years of
> reinsurance experience.   Today, we process more than $200 million in annual
> insurance premiums and manage over 700 captive reinsurance companies…

*See* Pages from SRI's website attached hereto as **Exhibit A**.

14.     SRI's website also describes in detail the company's method of establishing off-

shore reinsurance companies:

> -   **Formation of single owner Limited Capitalization offshore Reinsurance
>     Company:**   It is significantly less expensive to form and maintain an
>     insurance company in the Turks and Caicos Islands (TCI), British West
>     Indies, than in the United States.  Corporate capitalization requirements for
>     U.S. insurance companies are at least $150,000, whereas capitalization in TCI
>     is less than $10,000.  (Although annual fees are required to maintain a TCI
>     license, they are nominal.)  These advantages enable an insurance producer to
>     turn incoming funds into lower taxed insurance dollars for significantly less
>     capital up front.

4

- **Insurance producer realizes all underwriting profits and investment income:**  By forming a brother-sister relationship with a reinsurance company, an insurance producer can better diversify risk, manage the quality of business produced and maximize profits.  Because premiums are ceded from the direct writer to the reinsurance company, the owner of the company is able to realize the investment income from the premiums.  After all claims are paid and premiums earned, the owner receives the underwriting profits as well.

*See* Ex. A.

15.     SRI represents on its website that it files IRS Form 953(d) elections for "each of our reinsurance companies," which election allows foreign corporations to be treated as domestic corporations in the United States.  SRI further represents that, by virtue of its 953(d) elections, its reinsurance companies are "considered by the U.S. government to be operating as a U.S. corporation and are not considered to be a foreign corporation."  SRI further represents that "[a]ll reinsurance company funds are held in U.S. Banks.  The only 'offshore' aspect to the program is the domicile that allows for lower capitalization." *See* Ex. A.

16.     On information and belief, Family Heritage, Sierra Life, Ideal and Libre are all producer-owned reinsurance companies ("PORCs") organized and administered by SRI and/or Smith, and owned by XYZ Corporation and/or Jane Does 1-10, who are business associates of SRI and/or Smith.

### The Family Heritage Reinsurance Program

17.     In or about June of 1994, Security Life's predecessor, Congress Life Insurance Company (referred to collectively with the Plaintiff as "Security Life") entered into a Quota Share Reinsurance Agreement with Family Heritage (the "1994 Reinsurance Agreement"), pursuant to which Family Heritage agreed to provide reinsurance to cover a portion of Security Life's exposure to claims and losses incurred in connection with certain individual life insurance policies.  A true and correct copy of the 1994 Reinsurance Agreement is attached as **Exhibit B**.

The insurance program that was the subject of this reinsurance is referred to in this Complaint as the "Insurance Program."

18.     Arthur D. Buchheim signed the 1994 Reinsurance Agreement on behalf of Family Heritage. On information and belief, Buchheim is a business associate of Smith and/or SRI.

19.     From 1994 to the present, all of Security Life's contacts regarding the Insurance Program have been with SRI and Smith. All information provided to Security Life by Family Heritage, and later Sierra Life, and relating to the Insurance Program has been provided by SRI and/or Smith; likewise, all information Security Life has provided to Family Heritage and Sierra Family has been directed to SRI and/or Smith. Security Life has had no contact with Family Heritage or Sierra Family, or any other SRI PORC, by any means other than by contacting SRI or Smith.

20.     Security Life and Family Heritage entered into a subsequent reinsurance agreement in September 1999 which purported to be effective on August 15, 1997, for reinsurance of the same line of business (the "1997 Reinsurance Agreement"). A true and correct copy of the 1997 Reinsurance Agreement is attached to this Complaint as **Exhibit C**.

21.     Policies in the Insurance Program from 1994 to August 1997 were to be covered under the 1994 Reinsurance Agreement; policies written from August 1997 forward were to be covered by the 1997 Reinsurance Agreement.

22.     Buchheim also signed the 1997 Reinsurance Agreement on behalf of Family Heritage.

23.     Security Life executed a separate reinsurance agreement with Sierra Family, another SRI PORC, on September 29, 1997, also purportedly effective on August 15, 1997 (the "Sierra Family Agreement"), a copy of which is attached as **Exhibit D**. A portion of the

6

insurance sold from August 1997 forward as part of the Insurance Program was allocated to Sierra Family as reinsurer under this agreement.  Security Life is not aware of which policies in the Insurance Program are allocated to Family Heritage as reinsurer and which are allocated to Sierra Family as reinsurer.  SRI and/or Smith have been exclusively responsible for the allocation of the policies in the Insurance Program and have knowledge of how that allocation has been done.  SRI and Smith have at all times treated the Family Heritage Reinsurance Program as one program and have made no distinction between the portion reinsured under the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement.

24.     David B. Hall signed the Sierra Family Agreement on behalf of Sierra Family. On information and belief, Hall is a business associate of Smith and/or SRI.  Hall is or was also a Managing Producer for the Insurance Program who earned substantial commissions on premiums paid for policies in the insurance program.

25.     From the beginning, the risk ceded to Family Heritage and Sierra Family as set forth in the Reinsurance Agreement and the Sierra Family Agreement were treated by the parties as one program, subject to the same terms and conditions for reinsurance.  The reinsurance program established by these agreements is referred to in this Complaint as the "Family Heritage Reinsurance Program."  The 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are referred to collectively as the "Reinsurance Agreements."

### Administration Agreement Between Security Life and SRI for the Family Heritage Reinsurance Program

26.     SRI entered into an Insurance Administration Agreement with Security Life in 1994, and has served as the Administrator of the Insurance Program since that time.  A true and

correct copy of the Insurance Administration Agreement (the "Administration Agreement") is attached to this Complaint as **Exhibit E**.

27.     The Administration Agreement acknowledges that SRI "is knowledgeable in the insurance business and has the expertise, systems and procedures and other qualifications to efficiently and accurately administer the Policies…"

28.     Under the Administration Agreement, Security Life appointed SRI as its administrator for the Insurance Program. Among other things, SRI was charged with "servicing the agents and other producers of the Policies" in the Insurance Program; entering into contracts with agents; paying commissions to agents; preparing and mailing premium billings and engaging in all collection efforts relating to premiums; and paying claims and expenses relating to the policies in the Insurance Program.

29.     The Administration Agreement expressly provides that SRI is acting in "a fiduciary capacity" with respect to Security Life.

30.     The Administration Agreement gives Security Life the right to "inspect, copy and audit all the books and records relating to the transactions hereunder at any office of the Administrator or the office of any Account having insurance in force" with Security Life. Security Life reserved the right under the Administration Agreement to perform "periodic claim, underwriting, and financial audits at the Administrator's office." Finally, the Administration Agreement provided that Security Life "shall be the owner and entitled to possession of all books and records pertaining to the services provided hereunder."

31.     Security Life compensated SRI for its administration of the Insurance Program through per-policy issuance and maintenance fees, as well as per-claim fees.

32.     Security Life has the right to terminate the Administration Agreement immediately, as to all business governed by the Administration Agreement, upon the occurrence of several things, including misappropriation of funds by SRI, SRI's violation of criminal or insurance laws, or SRI's commission of any dishonest act.

### *Reinsurance Reserves; Security Required for Reinsurance Program*

33.     Under the 1994 Reinsurance Agreement, Security Life ceded to Family Heritage up to 90% of Security Life's liability for the Insurance Program. Under the 1997 Reinsurance Agreement and the Sierra Family Agreement, Security Life ceded 75% of its liability to the reinsurers. Security Life's liability included, but was not limited to, all policy death benefits, cash value amounts and premium refunds.

34.     Article II of the 1997 Reinsurance Agreement provides that "[t]he liability of the Reinsurer shall begin automatically, simultaneously with that of the Ceding Company [Security Life] under the Reinsured Policies regardless of the receipt of the reinsurance premiums by the Reinsurer if the Ceding Company has not received the insurance premiums from the producers of the Reinsured Policies. *It is the intention of this Agreement that the Reinsurer follows the fortunes of the Ceding Company in all respects.*" (Emphasis added.) Substantially the same language is contained in Article II of the 1994 Reinsurance Agreement and in Article II of the Sierra Family Agreement.

35.     In exchange for Family Heritage and Sierra Family taking a percentage of the risk of the policies issued under the Insurance Program, Security Life agreed to pay the reinsurers the same percentage of the net written premiums (meaning gross premiums written, less refunded premiums) for the program. Security Life was to deduct from those premiums owed: all agents and brokers commissions and other compensation paid relative to the policies in the Insurance

9

Program; all claims paid and allocated claim expense paid; all taxes, federal guaranty association assessments and similar assessments on the policies in the program; an agreed upon ceding fee due to Security Life; any special expenses, interest, damage or penalty incurred relative to the Insurance Program; and any amounts owed to Security Life from the producers of any of the policies in the Insurance Program.

36.    To meet statutory accounting and other regulatory requirements, Security Life was required to establish that there was adequate security available to ensure that Family Heritage would satisfy its obligations under the Reinsurance Agreements. In the absence of such security, Security Life could not take credit for the reinsurance and its surplus would be negatively impacted.

37.    To establish security for Family Heritage's performance of its obligations, the parties entered into a Funds Withheld and Investment Management Agreement, which was attached as Exhibit A to the Reinsurance Agreement (the "Funds Withheld Agreement") (part of **Exhibit C** to this Complaint).

38.    Buchheim signed the Funds Withheld Agreement on behalf of Family Heritage.

39.    Paragraph 1 of the Funds Withheld Agreement provides:

> In lieu of creating a trust to hold the reserves on the Reinsured Policies, [Family Heritage] agrees to provide funds to [Security Life] in an amount equal to the mortality reserve on life insurance, which [Security Life] would otherwise maintain upon the Reinsured Policies, plus an amount equal to the reserves which would otherwise be maintained by [Security Life] for claims incurred but unreported and claims reported but unpaid (hereinafter the "Required Reserves"). [Security Life] shall determine the amount of the Required Reserves and its determination shall be conclusive and accepted by [Family Heritage]. [Family Heritage] shall establish the Reserves in its accounting records in the same amount that [Security Life] takes reinsurance credit for in its accounting records.

40.    The Funds Withheld Agreement provided that Security Life would withhold from all amounts due to Family Heritage an amount equal to the Required Reserves (as defined in

paragraph 1 of the Funds Withheld Agreement). Those funds would be placed in a Funds Withheld Account, which would be held as a reserve against liabilities for the Insurance Program.

41.     Although the 1994 Reinsurance Agreement and the Sierra Family Agreement do not have a Funds Withheld Agreement, the parties agreed and at all times treated the Sierra Family portion of the business and the Family Heritage portion (under both the 1994 and 1997 Agreements) as one program. Accordingly, premiums relating to policies reinsured by Sierra Family, along with premiums for all policies reinsured by Family Heritage under either the 1994 or the 1997 Reinsurance Agreements, were placed in the funds withheld account for the Family Heritage Reinsurance Program.

## Lack of Distinction Between SRI PORCs; SRI and SRI PORC Involvement in Family Heritage Reinsurance Program

42.     Smith and SRI brought the Family Heritage Reinsurance Program to Security Life and proposed that the program be structured in the first instance with Family Heritage as Reinsurer and SRI as Administrator. SRI provided the agents to sell policies in the Insurance Program and negotiated Managing Producer Agreements on Security Life's behalf with the primary agents selling policies for the Insurance Program.

43.     At all times, all of Security Life's communications regarding the Family Heritage Reinsurance Program were through SRI and/or Smith. Although various entities and individuals were identified by SRI as having ownership interests in the various SRI PORCs, and those PORCs were identified at various points in time as participants in the Family Heritage Reinsurance Program, Security Life's dealings were at all times with SRI.

44.     Security Life understood, and was led by SRI and Smith to believe, that SRI and/or Smith or their affiliates owned and controlled all of the PORCs that had any involvement

11

in the Family Heritage Reinsurance Program.  SRI and Smith treated the PORCs as interchangeable and as indistinguishable from SRI, and did not provide notice or explanation to Security Life when an entity's involvement in the Family Heritage Reinsurance Program ended, another began or any other aspect of the PORCs' participation changed.

45.     At some time between 2000 and 2002, Security Life became aware that Libre, another SRI PORC, had involvement in the Family Heritage Reinsurance Program.  Security Life was not aware whether or how Libre had succeeded Family Heritage and/or Sierra Life, and its communications continued to be exclusively through representatives of SRI.

46.     In or about 2005, Security Life heard of Ideal for the first time, when SRI made that PORC the grantor of a trust established to secure Family Heritage's and/or Libre's performance under the Reinsurance Agreements.

47.     SRI notified Security Life in late 2010 that Family Heritage was "terminated in 2006." Security Life had no prior notice of such "termination."

48.     For purposes of this Complaint, Family Heritage, Sierra Family, Ideal, Libre, SRI, Smith, XYZ Corporation and Jane Does 1-10 are referred to collectively as the "SRI Defendants."

### *Reserve Deficiency; SRI Provides Letters of Credit*

49.     From very early in the administration of the Family Heritage Reinsurance Program, the funds held by Security Life under the Funds Withheld Agreement were insufficient to cover the Required Reserves as defined by the Reinsurance Agreements. The Funds Withheld Agreement provided that, under such circumstances, Security Life could recover any deficiency amount through a fee as provided in Article X of the 1997 Reinsurance Agreement. That Article provides:

> To compensate the Ceding Company for any surplus strain arising from a deficiency in the Required Reserves, the Reinsurer shall pay the Ceding company a fee equal to the actual amount charged for surplus strain. This fee shall be calculated quarterly and paid by the reinsurer upon receipt of a statement from the Ceding Company showing the amount due.

50.     By late 1999, Security Life had notified Family Heritage, through SRI, that the Funds Withheld Account was insufficient to cover the liabilities of the Insurance Program and that Family Heritage would have to provide additional security for the program to avoid further strain on Security Life's surplus and to meet accounting requirements for the program.

51.     In response to Security Life's demands for additional security for the Reinsurers' performance of their obligations under the Reinsurance Agreements, SRI arranged for Libre, another SRI PORC, to provide a Letter of Credit, with Security Life as beneficiary, for required reserves beyond those held in the Funds Withheld Account. Security Life accepted the Letter of Credit in lieu of the fee provided for in Article X of the 1997 Reinsurance Agreement. The Letter of Credit was renewed annually for several years.

52.     Security Life paid an annual fee for the Letters of Credit. SRI billed Security Life quarterly for the Letter of Credit Fee. As of 2005, the last year during which a Letter of Credit was in place to secure the SRI Defendants' obligations, that fee was $20,000 per quarter.

### SRI Proposes Trust Agreement to Replace Letters of Credit; The 2005 Trust Agreement

53.     In early 2005, SRI contacted Security Life about the annual renewal of the Letter of Credit. SRI stated that, although it was in the process of replacing the existing Letter of Credit, SRI wanted to know if Security Life would accept a trust account at INA for the benefit of Security Life, in lieu of a new Letter of Credit. Security Life indicated a willingness to consider a trust agreement in lieu of the Letter of Credit, but wanted more information about

13

INA. SRI reassured Security Life about INA, explaining that INA was a division of ACE Limited, an international insurance and reinsurance group.

54.     Eventually, SRI and Security Life agreed that, rather than replacing the then-existing Letter of Credit, Family Heritage would transfer sufficient funds into a trust account to secure payment of Family Heritage's obligations under the Reinsurance Agreement.

55.     On information and belief, Family Heritage did not have sufficient funds to establish the proposed trust agreement. Security Life is not aware of why Libre, which had provided the Letters of Credit, was not involved in the trust agreement. SRI arranged to have yet another of its PORCs, Ideal, fund the trust account as the grantor under the proposed trust agreement.

56.     Security Life, Ideal and INA entered into a Trust Agreement in or about May of 2005 (the "2005 Trust Agreement"), a true and correct copy of which is attached as **Exhibit F** to this Complaint.

57.     Under the 2005 Trust Agreement, Ideal, as Grantor, agreed to place in trust sufficient funds to secure payment of up to $1,000,000 in reinsured claims and expenses due from Family Heritage to Security Life under the Security Life/Family Heritage Reinsurance Agreement.

58.     INA is the Trustee of funds deposited under the 2005 Trust Agreement.

59.     Security Life is the Beneficiary of the 2005 Trust Agreement.

60.     The 2005 Trust Agreement expressly provides that INA will hold assets in trust under the agreement "for the sole use and benefit of the Beneficiary," Security Life.

61.     Section 1(a) of the 2005 Trust Agreement provides, in pertinent part:

> The Grantor shall establish the Trust Account and the Trustee shall administer the Trust Account in its name as Trustee *for the sole use and benefit of the*

14

*Beneficiary.* The Trust Account shall be subject to withdrawal *by the Beneficiary solely* as provided herein...

(Emphasis added.) The Trust Account was an account established at INA, Account No. MC4677 (the "INA Trust Account").

62.     Numerous other provisions of the 2005 Trust Agreement place sole control of the assets in trust in the hands of Security Life. Among other provisions, the agreement provides that

(a)     All assets transferred to the INA Trust Account were to be in such form that Security Life could, and INA must at Security Life's direction, negotiate any such assets without consent or signature from Ideal or any other person;

(b)     Security Life had the right, "at any time and from time to time," to withdraw assets from the INA Trust Account upon written notice to INA, without obligation to provide any other statement or document, other than the written notice, in order to make such a withdrawal. INA was obligated to "immediately take any and all steps necessary to transfer the Assets specified" upon receipt of a notice of withdrawal from Security Life.

(c)     INA was obligated to notify Security Life in writing of each deposit to or withdrawal from the INA Trust Account.

63.     The 2005 Trust Agreement expressly provides that "in the absence of a Withdrawal Notice the Trustee *shall allow no substitution or withdrawal of any Asset from the Trust Account.*" (Emphasis added.)

64.     The 2005 Trust Agreement could only be terminated after either Security Life or Ideal gave written notice of intention to terminate to INA, and after INA in turn gave written notification to both Security Life and Ideal. Transfer of assets out of the INA Trust Account, upon termination of the agreement, was allowed only upon receipt of Security Life's written approval of the termination of the 2005 Trust Agreement.

15

65.     The 2005 Trust Agreement replaced the Letters of Credit previously provided annually by Libre.

66.     Despite the fact that the SRI Defendants were no longer providing Letters of Credit after the 2005 Trust Agreement was put in place, SRI continued to fraudulently bill Security Life $20,000 per quarter until at least January 2011.

### *SRI's Improper Transfer of Trust Assets to Fifth Third;* *SRI's Representations to Security Life about Trust Assets*

67.     After April of 2006, Security Life stopped receiving statements for the INA Trust Account from INA.

68.     Security Life contacted INA to inquire about the INA Trust Account and to get statements for the account past April 2006. INA responded that the account had been closed since the end of June 2006. INA informed Security Life that the INA Trust Account was one of a large number of accounts that were transferred to Fifth Third Bank.

69.     SRI confirmed to Security Life that the funds had been transferred to Fifth Third. SRI told Security Life that it would send monthly statements for the Fifth Third account to Security Life going forward.

70.     In November 2006, Security Life began receiving monthly statements from SRI for a Fifth Third trust account number 44-44-000-6379606 (the "Fifth Third Trust Account").

71.     Based on its conversations with INA and SRI, Security Life understood that Fifth Third was a successor trustee to INA under the 2005 Trust Agreement. Security Life further understood, and was led by SRI to believe, that the assets that had previously been in the INA Trust Account were still being held for the benefit of Security Life by Fifth Third, pursuant to the 2005 Trust Agreement.

72.     SRI sent Fifth Third's account statements to Security Life for the entire period from 2006 through February 2011 and actively led Security Life to believe that the trust assets were still being handled consistent with the 2005 Trust Agreement for the benefit of Security Life as Beneficiary.  SRI's actions and representations constitute an acknowledgment of Security Life's rights as Beneficiary under the 2005 Trust Agreement and/or, on information and belief, were intended by SRI to conceal its improper transfer of assets from the INA Trust Account to the Fifth Third Trust Account.

73.     The last statement Security Life received for the INA Trust Account was for the period April 1-30, 2006.  As of April 30, 2006, the value of the assets in the INA Trust Account was $1,142,422.96.

74.     At no time did Security Life request, direct or authorize the withdrawal of funds from the INA Trust Account, nor did Security Life ever approve the termination of the 2005 Trust Agreement.

75.     On or about March 1, 2011, Security Life became concerned that, contrary to its understanding since 2006, the assets held in trust by Fifth Third were not being held for the benefit of Security Life, or that the assets were not otherwise being handled consistent with the 2005 Trust Agreement.

76.     On March 2, 2011, Security Life contacted Fifth Third to confirm that the assets in that account were being held for the benefit of Security Life pursuant to the 2005 Trust Agreement.  Fifth Third advised Security Life that information regarding the Fifth Third Trust Account was not accessible by Security Life because Security Life did not appear on the account.

77.     On or about March 3, 2011, Security Life contacted SRI to advise it of the problem with the Trust Account. On or about March 4, 2011, SRI, acting on behalf of Ideal, gave Fifth Third authority to discuss the Fifth Third Trust Account with Security Life.

78.     In a series of exchanges in early March 2011, Security Life contacted Fifth Third to determine how the trust assets that were subject to the 2005 Trust Agreement came to be transferred from INA to Fifth Third and to demand that the trust assets be preserved for the benefit of Security Life. During those exchanges, Fifth Third confirmed to Security Life that the funds used to establish the Fifth Third Trust Account were transferred directly from the INA Trust Account to the Fifth Third Trust Account.

79.     At some point during these conversations with Fifth Third and SRI, Security Life became aware that the assets held in trust at Fifth Third, which had been directly transferred from the INA Trust Account held for the benefit of Security Life, were being held at Fifth Third under a 2006 Trust Agreement, to which Security Life was not a party. A true and correct copy of the 2006 Trust Agreement is attached to this Complaint as **Exhibit G**.

80.     The 2006 Trust Agreement is between Ideal as Grantor, Fifth Third as Trustee, and an SRI-affiliated company called First Automotive Risk Retention Group, Inc. ("First Automotive"), as Beneficiary. Security Life is not mentioned in the 2006 Trust Agreement and had no knowledge of that agreement, or the removal of Security Life as the Beneficiary of the trust assets, until March 2011.

81.     Smith Signed the 2006 Trust Agreement as President of both Ideal and First Automotive.

82.     On March 15, 2011, Security Life met with representatives of SRI to determine how the assets came to be transferred from INA to Fifth Third and to demand a revised Trust

Agreement, including Security Life as Beneficiary, consistent with the 2005 Trust Agreement, by March 31, 2011. SRI acknowledged that a mistake had been made, that the funds should have been held for Security Life, and agreed to work to correct it as quickly as possible.

83.     On March 17, 2011, Security Life contacted SRI to inquire as to the status of SRI's efforts to restore the 2005 Trust Agreement.

84.     On March 17, 2011, Security Life wrote to Fifth Third to advise Fifth Third that: (a) Security Life had confirmed that the funds in the Fifth Third Account were taken from the INA Trust Account; and (b) that Ideal and SRI had acknowledged the error and agreed to work on a plan for correcting it. Security Life asked Fifth Third not to process any distributions from (or changes to) the Fifth Third Trust Account without the consent of Security Life.

85.     On or about March 30, 2011, Security Life contacted Fifth Third once again to reiterate that it had a valid legal claim to the assets being held in the Fifth Third Trust Account. Security Life once again requested that Fifth Third not permit any distributions or withdrawals from the Fifth Third Trust Account until Security Life was able to resolve its issues with Ideal/SRI and enter into a mutually acceptable plan for the handling of the assets held in trust.

86.     On information and belief, based on the most recent statements received by Security Life relating to the Fifth Third Trust Account, the assets in that account had a value of $1,276,767 as of February 28, 2011.

87.     Late in the day on April 1, 2011, Fifth Third notified Security Life, through its counsel, that a distribution request had been made, apparently by SRI on behalf of Ideal and/or on behalf of First Automotive, and that all assets held in the Fifth Third Trust Account had been distributed.

19

88.     As a result of the loss of the assets held in trust, Security Life's statutory capital and surplus suffered an immediate decline of at least $1,275,715 as of December 31, 2010.  This decline may result in adverse regulatory action and may have a deleterious impact on Security Life's A.M Best rating.  These developments would significantly impair Security Life's ability to produce new business and potentially impair its ability to retain in-force business.

## COUNT I:  PIERCING CORPORATE VEIL AS TO SRI AND SRI PORCs

89.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

90.     SRI approached Security Life to propose the creation of the Family Heritage Reinsurance Program.  All communications regarding all aspects of the Insurance Program and the Family Heritage Reinsurance Program were between Security Life and SRI.

91.     SRI has at all times treated the PORCs, or producer-owned reinsurance companies, that it owns and/or operates as interchangeable entities that are indistinguishable from SRI.

92.     There is no meaningful distinction between the SRI Defendants, including SRI, Family Heritage, Sierra Family, Libre and Ideal, as well as XYZ Corporation and Jane Does 1-10.  On information and belief:

    (a)    Family Heritage, Sierra Family, Libre and Ideal are all insufficiently capitalized for purposes of their corporate undertakings;

    (b)    The SRI Defendants, including SRI and its PORCs, have failed to observe corporate formalities between and among themselves;

    (c)    Family Heritage, Sierra Family, Libre and Ideal have, at times relevant to this complaint, been insolvent;

    (d)    SRI has commingled funds between and among the other SRI Defendants;

      (e)    Family Heritage, Sierra Family, Libre and Ideal have not had functioning officers and directors independent of SRI; and

      (f)    Family Heritage, Sierra Family, Libre and Ideal do not have corporate records separate and apart from SRI.

93.    On information and belief, Family Heritage, Sierra Family, Libre and Ideal have not had independence from SRI and/or Smith, and to the contrary have been operated as alter egos for the dealings of SRI and/or Smith.

94.    The corporate veil should be pierced with respect to Family Heritage, Sierra Family, Libre and Ideal and SRI and/or Smith.

## COUNT II: DECLARATORY JUDGMENT - ALTER EGO LIABILITY

95.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

96.    Family Heritage, Sierra Family, Libre and Ideal were and continue to be controlled by principals of each other, by Smith and/or by SRI, to the extent that they have independence, it is in form only.

97.    Smith and SRI used the corporate identities of Family Heritage, Sierra Family, Libre and Ideal as a subterfuge to justify wrongdoing and to perpetuate a fraud on Security Life.

98.    As a result of the SRI Defendants' actions, Plaintiff is entitled to a declaration that Family Heritage, Sierra Family, Ideal and Libre are alter egos of one another and/or of SRI.

## COUNT III: BREACH OF REINSURANCE AGREEMENTS AND FUNDS WITHHELD AGREEMENT

99.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

100. The 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are binding agreements between Security Life, Family Heritage and Sierra Family.

101. Security Life satisfied all of its obligations under the Reinsurance Agreements.

102. Libre and Ideal undertook some or all of the obligations of Family Heritage and Sierra Family under the Family Heritage Reinsurance Program.

103. The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program.

104. The SRI Defendants' actions, as described above, constitute breaches of the Reinsurance Agreement, including the Funds Withheld Agreement that forms a significant part of the parties' relationship. The SRI Defendants' breaches include, but are not limited to:

    (a)    Failure to provide funds sufficient to avoid a deficiency in reserves required for the Insurance Program;

    (b)    Failure to pay amounts due to Security Life under the Reinsurance Agreements;

    (c)    Failure to timely and accurately report on the reserves for the policies included in the Insurance Program;

    (d)    Refusing Security Life's demands for the establishment of reserves sufficient to cover liabilities for the ceded portion of the Insurance Program; and

    (e)    Failure to inform Security Life of the insolvency, termination or inability to perform of Family Heritage and other SRI Defendant entities.

105. As a direct and proximate result of the multiple breaches of the Reinsurance Agreements by the SRI Defendants, Security Life has suffered significant damage, in an amount in excess of $75,000 to be proven at trial.

## COUNT IV: BREACH OF 2005 TRUST AGREEMENT

106. Security Life restates the previous allegations of this Complaint as if fully set forth herein.

107. The 2005 Trust Agreement was a binding agreement among Security Life, Ideal and INA.

108. Security Life satisfied any obligation it had under the 2005 Trust Agreement.

109. By the actions described above, Ideal breached its duties as Grantor under the 2005 Trust Agreement.

110. The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program.

111. By the actions described above, INA and/or its successors in interest breached their duties as Trustee under the 2005 Trust Agreement.

112. As a direct and proximate result of the breaches by the SRI Defendants and INA, Security Life has suffered significant damage in an amount in excess of $75,000 to be proven at trial.

113. The harm caused by the breaches by the SRI Defendants and INA will continue unless Defendants are enjoined from handling the assets placed in trust in any manner inconsistent with the 2005 Trust Agreement.

## COUNT V: BREACH OF THE ADMINISTRATION AGREEMENT

114. Security Life restates the previous allegations of this Complaint as if fully set forth herein.

115.    SRI and Security Life entered into the Administration Agreement, which is a valid and binding contract between them.

116.    Security Life has satisfied its obligations under the Administration Agreement.

117.    SRI has breached the Administration Agreement in numerous ways, including but not limited to:

(a)    Failure to terminate policies timely for lack of premium payments by insureds, resulting in overstatement of premium;

(b)    Failure to seek collection of amounts advanced to agents;

(c)    Payment of override commissions to producers on policies past the tenth anniversary of such policies in contravention of the provisions of the agreements;

(d)    Failure to properly escheat unclaimed property related to certain death claims on a timely basis; and

(e)    Failure to fulfill its contractual and fiduciary duties to Security Life by, among other things, transferring the INA Trust Account assets to Fifth Third and then directing the distribution of those assets out of the Fifth Third Account, and by billing Security Life $20,000 per quarter for Letter of Credit fees after the 2005 Trust Agreement replaced the Letters of Credit.

118.    As a direct and proximate result of SRI's breaches of the Administration Agreement, Security Life has suffered damages in excess of $75,000 to be proven at trial.

119.    SRI's breaches of the Administration Agreement, and the consequent damage to Security Life, will continue unless enjoined.

## COUNT VI:  BREACH OF FIDUCIARY DUTY

120.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

121.    Security Life trusted and confided in the SRI Defendants generally with respect to the Insurance Program and the Family Heritage Reinsurance Program.  Under the circumstances,

24

the SRI Defendants were all required to act for the benefit of Security Life in all matters relating to their relationships with Security Life.

122. SRI owed Security Life a fiduciary duty as Administrator of the Insurance Program.

123. Family Heritage and its successors and alter egos, including the SRI Defendants, owed Security Life fiduciary duties as reinsurers under the Reinsurance Agreements.

124. Ideal, and its successors and alter egos including the SRI Defendants, owed Security Life a fiduciary duty as the grantor under the 2005 Trust Agreement.

125. The SRI Defendants owed Security Life fiduciary duties per se, or undertook de facto fiduciary obligations to Security Life.

126. By the actions described above, the SRI Defendants breached their fiduciary duties to Security Life.

127. As a direct and proximate result of the SRI Defendants' multiple breaches of fiduciary duty, Security Life has suffered damages in excess of $75,000 to be proven at trial.

### COUNT VII: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

128. Security Life restates the previous allegations of this Complaint as if fully set forth herein.

129. The SRI Defendants, INA and INA's successors or assigns, owed Security Life a common law duty of good faith and fair dealing.

130. By their actions described above, Defendants have breached their duty of good faith and fair dealing by acting dishonestly and unreasonably toward Security Life.

131. As a direct and proximate result of Defendants' actions, Security Life has suffered damages in excess of $75,000 to be proven at trial.

## COUNT VIII: FRAUD

132.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

133.    Smith and the other SRI Defendants made false representations to Security Life, including but not limited to the following:

(a)    The SRI Defendants failed to disclose to Security Life that, in or about April 2006, they arranged for the transfer of trust assets in the INA Trust Account and the effective termination of the 2005 Trust Agreement.

(b)    The SRI Defendants established the 2006 Trust Agreement and Fifth Third Trust Account, eliminating Security Life as a beneficiary of the trust assets, without notifying Security Life.

(c)    The SRI Defendants attempted to conceal their wrongful transfer of the trust assets from the INA Trust Account to the Fifth Third Trust Account, and their fraudulent termination of the 2005 Trust Agreement and establishment of the 2006 Trust Agreement, by representing to Security Life in late 2006 that the funds were still being held in trust for the benefit of Security Life and sending Security Life statements for the Fifth Third Trust Account from late 2006 to early 2011.

(d)    The SRI Defendants represented to Security Life in March 2011 that the funds in the Fifth Third Trust Account were being held for the benefit of Security Life, when in fact they were not.

(e)    Immediately after representing to Security Life that the assets in the Fifth Third Trust Account were being held for the benefit of Security Life, the SRI Defendants directed that those assets be distributed out of the Fifth Third Trust Account, without notice to Security Life and in direct contravention of Security Life's contemporaneous assurances.

(f)    The SRI Defendants, and SRI specifically, submitted fraudulent bills to Security Life continuously from approximately April 2005 through at least January 2011, for quarterly Letter of Credit fees of $20,000, for Letters of Credit that were no longer in place for the benefit of Security Life.

134.    Defendants' misrepresentations related to past or existing material facts that were susceptible of knowledge by Defendants.

135.    Defendants made the misrepresentations to Security Life knowing of their falsity or, in the alternative, made the misrepresentations to Security Life without knowing whether those representations were true or false.

136.    Defendants made the misrepresentations to Security Life with the intention of inducing Security Life to act in reliance on those misrepresentations.

137.    Defendants' misrepresentations caused Security Life to act in reliance on those misrepresentations.

138.    As a direct and proximate result of Defendants' misrepresentations, Security Life has suffered damages in excess of $75,000 to be proven at trial.

## COUNT IX:  CONVERSION

139.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

140.    Security Life has a property interest in the assets that were placed in trust under the 2005 Trust Agreement, including an interest in any interest earned on such assets while they have been held in trust.

141.    The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

142.    The SRI Defendants, through their actions in transferring trust assets from the INA Trust Account to the Fifth Third Trust Account, and then in directing that the trust assets be distributed out of the Fifth Third Trust Account, have deprived Security Life of its interest in the trust assets.

143.    As a direct and proximate result of the SRI Defendants' actions, Security Life has suffered damages in excess of $75,000 to be proven at trial.

## COUNT X:  UNJUST ENRICHMENT

144.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

145.    Security Life entered into a 2005 Trust Agreement with Ideal and INA to hold certain funds in trust for the benefit of Security Life.

146.    The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

147.    As a result of the actions of the SRI Defendants in transferring the assets of the INA Trust Account to the Fifth Third Trust Account, and then directing the distribution of those assets out of the Fifth Third Trust Account, the SRI Defendants have had a benefit conferred upon them and having knowingly accepted that benefit.

148.    The SRI Defendants' acceptance and retention of the benefits of the assets subject to the 2005 Trust Agreement would be inequitable.

149.    As a direct and proximate result of the SRI Defendants' actions, the SRI Defendants have been unjustly enriched and Security Life has been damaged in an amount in excess of $75,000 to be proven at trial.

## COUNT XI:  CONSTRUCTIVE TRUST

150.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

151.    Security Life entered into a 2005 Trust Agreement with Ideal and INA to hold certain funds in trust for the benefit of Security Life.

152.    The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

153.    Rather than holding the funds in trust for Security Life, the SRI Defendants and/or INA transferred the assets to Fifth Third.

154.    On information and belief, the SRI Defendants, or some of them, arranged to have the trust assets originally held in the INA Trust Account under the 2005 Trust Agreement placed under trust with Fifth Third under a new trust agreement, under which Security Life was no longer the beneficiary of the trust assets.

155.    On information and belief, the SRI Defendants, or some of them, directed that the trust assets being held in the Fifth Third Trust Account be distributed out of that account, depriving Security Life of the benefit of those funds.

156.    The SRI Defendants have received the benefit of Security Life's assets as beneficiary under the 2005 Trust Agreement.

157.    Security Life is entitled to have a constructive trust placed on the assets of SRI and/or the SRI Defendants in the full amount of the balance of the Fifth Third Trust Account on the date of final distribution out of that account, plus interest.

## COUNT XII:  INJUNCTIVE RELIEF

158.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

159.    Defendants' actions have caused significant and irreparable harm to Security Life, including but not limited to an immediate decline of over $1 million in Security Life's statutory capital and surplus. As a direct and proximate result of Defendants' actions, Security Life's ability to produce new business and retain its current business is significantly impaired.

160.    Unless the Court grants Security Life injunctive relief, Security Life will continue to suffer significant and irreparable harm with respect to the Insurance Program, the Family Heritage Reinsurance Program, and its business generally.

161.    Security Life is entitled to temporary, preliminary and permanent injunctive relief as to the SRI Defendants, as follows:

(a)    Requiring the SRI Defendants to cooperate in the termination and winding up of the Administrative Agreement and administration of the Insurance Program, including but not limited to transferring all files (paper and electronic) relating in any way to the Insurance Program to Security Life, arranging for the change of all email and street or P.O. Box addresses from the SRI Defendants to Security Life, and cooperating in all respects with Security Life and/or its designated agents in transferring the administration of policies in the Insurance Program from the SRI Defendants to Security Life;

(b)    Cooperating in all respects with the termination of the Reinsurance Agreements and, at Security Life's option, the transfer of the ceded portion of the Insurance Program to another reinsurer or reinsurers;

(c)    Such other injunctive relief as the Court deems necessary to remove the SRI Defendants from the Administration and/or reinsurance of the Insurance Program.

WHEREFORE, Security Life prays for an Order:

1.    Entering judgment in favor of Security Life and against Defendants for all damages proximately resulting from Defendants' actions;

2.    Entering declaratory judgment that Family Heritage, Sierra Family, Libre, and Ideal are the alter egos of one another and/or SRI.

3.    Imposing a constructive trust on Defendants' assets;

30

4.   Granting Security Life the injunctive relief requested herein;

5.   Granting Security Life its reasonable costs and attorneys' fees in this action; and

6.   Granting such other and further relief as the Court may deem just and equitable.

Dated: May 26, 2011               BEST & FLANAGAN LLP

By _____
Robert L. Meller, Jr. (#71912)
Sarah E. Crippen (#223074)
Elizabeth C. Borer (#389943)
225 South Sixth Street, Suite 4000
Minneapolis, MN  55402-4690
(612) 339-7121

rmeller@bestlaw.com
scrippen@bestlaw.com
eborer@bestlaw.com

## VERIFICATION

I, Daniel R. Bauer, state that I am the Chief Financial Officer of Plaintiff Security Life Insurance Company of America.  I verify that the statements in the above Complaint are true and correct to the best of my knowledge.

_____
Daniel R. Bauer

Subscribed and sworn to before me
this 26 day of ~~April~~, 2011.
                    MAY

_____
Notary Public



13916.310004.1310103_2