## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Security Life Insurance Company of America, a Minnesota corporation | Civil File No. 11-cv-1358-MJD-JJK |
| Plaintiff, | Chief Judge Michael J. Davis |
| | Magistrate Judge Jeffrey J. Keyes |
| v. | |
| Southwest, Reinsure, Inc., a New Mexico Corporation; James B. Smith; Family Heritage Reinsurance Co., Ltd., a corporation organized under the laws of the Turks and Caicos Islands; Ideal Insurance Company, Ltd., a corporation organized under the laws of the Turns and Caicos Islands; Sierra Family Life Reinsurance Co., Ltd, a corporation organized under the laws of the Turns and Caicos Islands; Libre Insurance Co., Ltd., a corporation organized under the laws of the Turns and Caicos Islands; INA Trust FSB, a federally chartered savings bank, ABC Corporation and John Does 1-10; and XYZ Corporation and Jane Does 1-10, | **ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS SOUTHWEST REINSURANCE, INC., JAMES B. SMITH AND IDEAL INSURANCE COMPANY, LTD. TO VERIFIED COMPLAINT** *Jury Trial Demanded* |
| Defendants. | |

NOW COME Defendants Southwest Reinsure, Inc., Ideal Insurance Company, Ltd. and James B. Smith ("Defendants"), through their undersigned attorneys, Reed Smith LLP, and hereby file their Answer and Affirmative Defenses to the Verified Complaint of Plaintiff Security Life Insurance Company of America ("Plaintiff" or "Security Life").

## THE PARTIES

1.      Security Life Insurance Company of America ("Security Life") is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 1 and therefore deny these allegations and demand

strict proof of these allegations.

2.      Southwest Reinsure, Inc. (referred to in this Complaint as "SRI" and referred to in some documents as "SouthwestRe") is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico.

**ANSWER**      The allegations in Paragraph 2 are admitted.

3.      James B. Smith ("Smith") is, on information and belief, the majority shareholder in SRI. Smith is SRI's President and CEO and is a resident of the state of New Mexico. SRI and/or Smith have been the sole representatives to Security Life as to the Defendants' actions as alleged in this Complaint.

**ANSWER**      Defendants deny the allegations in Paragraph 3, but admit that James B.

Smith is the President and CEO of Southwest Reinsure, Inc.

4.      Family Heritage Reinsurance Company, Ltd. ("Family Heritage") is a corporation organized under the laws of the Turks and Caicos Islands. Its principal place of business is in Albuquerque, New Mexico. On information and belief, Family Heritage was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

**ANSWER**      Defendants deny the allegations in Paragraph 4.

5.      Ideal Insurance Company, Ltd. ("Ideal") is a corporation organized under the laws of the Turks and Caicos Islands. Its principal place of business is in Albuquerque, New Mexico. On information and belief, Ideal was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

**ANSWER**      Defendants deny the allegations in Paragraph 5, but admit that Ideal is a

corporation organized under the laws of the Turks and Caicos Islands with its principal place of

business in Albuquerque, New Mexico.


6.      Sierra Family Life Insurance Company, Ltd. ("Sierra Family") is a corporation organized under the laws of the Turks and Caicos Islands. Its principal place of business is in Albuquerque, New Mexico. On information and belief, Sierra Family was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

**ANSWER**      Defendants deny the allegations in Paragraph 6.


7.      Libre Insurance Company, Ltd. ("Libre") is a corporation organized under the laws of the Turks and Caicos Islands. Its principal place of business is in Albuquerque, New Mexico. On information and belief, Libre was organized and administered by SRI and/or Smith and is owned and operated in substantial part by SRI, Smith and/or their affiliates, including XYZ Corporation and Jane Does 1-10.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 7 and therefore deny these allegations and demand

strict proof of these allegations.


8.      INA Trust FSB is a federally chartered savings bank with its principal place of business in Philadelphia, Pennsylvania. ABC Corporation and/or John Does I-10 are, on information and belief, successors to INA for purposes of the allegations of this Complaint.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 8 and therefore deny these allegations and demand

strict proof of these allegations.


9.      XYZ Corporation and/or Jane Does 1-10 are, on information and belief, entities and individuals associated with Smith and SRI who are the successors to the Turks and Caicos corporations identified as Defendants in this action, have past or present ownership interests in those corporations, and/or are the alter egos of those corporations and/or SRI.

**ANSWER**      Defendants deny the allegations in Paragraph 9.

## JURISDICTION & VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is diversity between the parties and the amount in controversy exceeds $75,000.

**ANSWER**     The allegations in Paragraph 10 are legal conclusions as to which no

response is required and are therefore denied.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, inasmuch as Defendants have transacted business in this District during times relevant to this action and a substantial part of the events giving rise to this action have occurred in this District.

**ANSWER**     The allegations in Paragraph 11 are legal conclusions as to which no

response is required and are therefore denied.

12.     Jurisdiction and venue are also proper under various agreements between and among the parties, which provide for the application of Minnesota law, contain the agreement of Defendants, or some of them, to be sued in any U.S. District Court, and provide for the Minnesota Commissioner of Insurance to accept service on behalf of Defendants.

**ANSWER**     The allegations in Paragraph 12 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the

agreements themselves are the best evidence of their contents and deny the remaining allegations

in Paragraph 12 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the agreements.

## FACTS

### *Smith and the SRI Family of Companies*

13.     SRI's website describes Smith as the founder of SRI and an "industry luminary." SRI describes its business as follows:

> Recognized as one of the most knowledgeable organizations in the reinsurance arena, SouthwestRe provides the full spectrum of policy and financial administration for organizations that sell insurance products. We offer customized insurance solutions designed to create profit opportunities for our clients while reducing their financial risk. Ultimately, SouthwestRe makes it possible for our insurance producer clients to share

in the back-end management profits as well as the front-end commissionable sales.

We accomplish this through two means: First, we create and administer insurance products such as automotive dealer F&I products and financial institution products, and second, we form and manage producer-owned reinsurance companies (PORCs).

***

All of our innovative programs are backed by more than 20 solid years of reinsurance experience. Today, we process more than $200 million in annual insurance premiums and manage over 700 captive reinsurance companies...

*See* Pages from SRI's website attached hereto as **Exhibit A**.

**ANSWER**     Defendants deny the allegations in Paragraph 13, but admit that SRI's website included the quoted language on April 25, 2011.

14.     SRI's website also describes in detail the company's method of establishing off-shore reinsurance companies:

**Formation of single owner Limited Capitalization offshore Reinsurance Company**: It is significantly less expensive to form and maintain an insurance company in the Turks and Caicos Islands (TCI), British West Indies, than in the United States. Corporate capitalization requirements for U.S. insurance companies are at least $150,000, whereas capitalization in TCI is less than $10,000. (Although annual fees are required to maintain a TCI license, they are nominal.) These advantages enable an insurance producer to turn incoming funds into lower taxed insurance dollars for significantly less capital up front.

**Insurance producer realizes all underwriting profits and investment income**: By forming a brother-sister relationship with a reinsurance company, an insurance producer can better diversify risk, manage the quality of business produced and maximize profits. Because premiums are ceded from the direct writer to the reinsurance company, the owner of the company is able to realize the investment income from the premiums. After all claims are paid and premiums earned, the owner receives the underwriting profits as well.

*See* Ex. A.

**ANSWER**     Defendants deny the allegations in Paragraph 14, but admit that SRI's website contained the quoted language on April 25, 2011.

15.     SRI represents on its website that it files IRS Form 953(d) elections for "each of our reinsurance companies," which election allows foreign corporations to be treated as domestic corporations in the United States. SRI further represents that, by virtue of its 953(d) elections, its reinsurance companies are "considered by the U.S. government to be operating as a U.S. corporation and are not considered to be a foreign corporation." SRI further represents that "[a]l1 reinsurance company funds are held in U.S. Banks. The only `offshore' aspect to the program is the domicile that allows for lower capitalization." See Ex. A.

**ANSWER**     Defendants deny the allegations in Paragraph 15, but admit that SRI's website contained the quoted language on April 25, 2011.

16.     On information and belief; Family Heritage, Sierra Life, Ideal and Libre are all producer-owned reinsurance companies ("PORCs") organized and administered by SRI and/or Smith, and owned by XYZ Corporation and/or Jane Does 1-10, who are business associates of SRI and/or Smith.

**ANSWER**     Defendants deny the allegations in Paragraph 16.

### The Family Heritage Reinsurance Program

17.     In or about June of 1994, Security Life's predecessor, Congress Life Insurance Company (referred to collectively with the Plaintiff as "Security Life") entered into a Quota Share Reinsurance Agreement with Family Heritage (the "1994 Reinsurance Agreement"), pursuant to which Family Heritage agreed to provide reinsurance to cover a portion of Security Life's exposure to claims and losses incurred in connection with certain individual life insurance policies. A true and correct copy of the 1994 Reinsurance Agreement is attached as Exhibit B. The insurance program that was the subject of this reinsurance is referred to in this Complaint as the "Insurance Program."

**ANSWER**     The allegations in Paragraph 17 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 1994 Reinsurance Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 17 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 1994 Reinsurance Agreement.

18.     Arthur D. Buchheim signed the 1994 Reinsurance Agreement on behalf of Family Heritage. On information and belief, Buchheim is a business associate of Smith and/or SRI.

**ANSWER**     Defendants deny the allegations in Paragraph 18, but admit that Arthur D.

Buchheim signed the 1994 Reinsurance Agreement on behalf of Family Heritage.


19.     From 1994 to the present, all of Security Life's contacts regarding the Insurance Program have been with SRI and Smith. All information provided to Security Life by Family Heritage, and later Sierra Life, and relating to the Insurance Program has been provided by SRI and/or Smith; likewise, all information Security Life has provided to Family Heritage and Sierra Family has been directed to SRI and/or Smith. Security Life has had no contact with Family Heritage or Sierra Family, or any other SRI PORC, by any means other than by contacting SRI or Smith.

**ANSWER**     Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 19 and therefore deny these allegations and demand

strict proof of these allegations.


20.     Security Life and Family Heritage entered into a subsequent reinsurance agreement in September 1999 which purported to be effective on August 15, 1997, for reinsurance of the same line of business (the "1997 Reinsurance Agreement"). A true and correct copy of the 1997 Reinsurance Agreement is attached to this Complaint as **Exhibit C**.

**ANSWER**     The allegations in Paragraph 20 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 1997

Reinsurance Agreement itself is the best evidence of its contents and deny the remaining

allegations in Paragraph 20 to the extent that they are inconsistent with, mischaracterizations of,

or misstatements of the contents of the 1997 Reinsurance Agreement.


21.     Policies in the Insurance Program from 1994 to August 1997 were to be covered under the 1994 Reinsurance Agreement; policies written from August 1997 forward were to be covered by the 1997 Reinsurance Agreement.

**ANSWER**     The allegations in Paragraph 21 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 1997

Reinsurance Agreement itself is the best evidence of its contents and deny the remaining

allegations in Paragraph 21 to the extent that they are inconsistent with, mischaracterizations of,

or misstatements of the contents of the 1997 Reinsurance Agreement.

22.     Buchheim also signed the 1997 Reinsurance Agreement on behalf of Family Heritage.

**ANSWER**     The allegations in Paragraph 22 are admitted.

23.     Security Life executed a separate reinsurance agreement with Sierra Family, another SRI PORC, on September 29, 1997, also purportedly effective on August 15, 1997 (the "Sierra Family Agreement"), a copy of which is attached as **Exhibit D**. A portion of the insurance sold from August 1997 forward as part of the Insurance Program was allocated to Sierra Family as reinsurer under this agreement. Security Life is not aware of which policies in the Insurance Program are allocated to Family Heritage as reinsurer and which are allocated to Sierra Family as reinsurer. SRI and/or Smith have been exclusively responsible for the allocation of the policies in the Insurance Program and have knowledge of how that allocation has been done. SRI and Smith have at all times treated the Family Heritage Reinsurance Program as one program and have made no distinction between the portion reinsured under the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement.

**ANSWER**     Defendants deny the allegations in Paragraph 23. Answering further,

Defendants state that the Sierra Family Agreement itself is the best evidence of its contents and

deny the remaining allegations in Paragraph 23 to the extent that they are inconsistent with,

mischaracterizations of, or misstatements of the contents of the Sierra Family Agreement.

24.     David B. Hall signed the Sierra Family Agreement on behalf of Sierra Family. On information and belief, Hall is a business associate of Smith and/or SRI. Hall is or was also a Managing Producer for the Insurance Program who earned substantial commissions on premiums paid for policies in the insurance program.

**ANSWER**     Defendants deny the allegations in Paragraph 24, but admit that David B.

Hall signed the Sierra Family Agreement on behalf of Sierra Family.

25.     From the beginning, the risk ceded to Family Heritage and Sierra Family as set forth in the Reinsurance Agreement and the Sierra Family Agreement were treated by the parties as one program, subject to the same terms and conditions for reinsurance. The reinsurance

program established by these agreements is referred to in this Complaint as the "Family Heritage Reinsurance Program." The 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are referred to collectively as the "Reinsurance Agreements."

**ANSWER**     Defendants deny the allegations in Paragraph 25.

### *Administration Agreement Between Security Life and SRI*
### *for the Family Heritage Reinsurance Program*

26.     SRI entered into an Insurance Administration Agreement with Security Life in 1994, and has served as the Administrator of the Insurance Program since that time. A true and correct copy of the Insurance Administration Agreement (the "Administration Agreement") is attached to this Complaint as **Exhibit E**.

**ANSWER**     The allegations in Paragraph 26 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 26 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

27.     The Administration Agreement acknowledges that SRI "is knowledgeable in the insurance business and has the expertise, systems and procedures and other qualifications to efficiently and accurately administer the Policies..."

**ANSWER**     The allegations in Paragraph 27 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 27 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

28.     Under the Administration Agreement, Security Life appointed SRI as its administrator for the Insurance Program. Among other things, SRI was charged with "servicing the agents and other producers of the Policies" in the Insurance Program; entering into contracts with agents; paying commissions to agents; preparing and mailing premium billings and engaging in all collection efforts relating to premiums; and paying claims and expenses relating to the policies in the Insurance Program.

**ANSWER**     The allegations in Paragraph 28 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 28 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

29.     The Administration Agreement expressly provides that SRI is acting in "a fiduciary capacity" with respect to Security Life.

**ANSWER**     The allegations in Paragraph 29 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 29 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

30.     The Administration Agreement gives Security Life the right to "inspect, copy and audit all the books and records relating to the transactions hereunder at any office of the Administrator or the office of any Account having insurance in force" with Security Life. Security Life reserved the right under the Administration Agreement to perform "periodic claim, underwriting, and financial audits at the Administrator's office." Finally, the Administration Agreement provided that Security Life "shall be the owner and entitled to possession of all books and records pertaining to the services provided hereunder."

**ANSWER**     The allegations in Paragraph 30 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 30 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

31.     Security Life compensated SRI for its administration of the Insurance Program through per-policy issuance and maintenance fees, as well as per-claim fees.

**ANSWER**      The allegations in Paragraph 31 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 31 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

32.      Security Life has the right to terminate the Administration Agreement immediately, as to all business governed by the Administration Agreement, upon the occurrence of several things, including misappropriation of funds by SRI, SRI's violation of criminal or insurance laws, or SRI's commission of any dishonest act.

**ANSWER**      The allegations in Paragraph 32 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Administration Agreement itself is the best evidence of its contents and deny the remaining allegations in Paragraph 32 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Administration Agreement.

### Reinsurance Reserves; Security Required for Reinsurance Program

33.      Under the 1994 Reinsurance Agreement, Security Life ceded to Family Heritage up to 90% of Security Life's liability for the Insurance Program. Under the 1997 Reinsurance Agreement and the Sierra Family Agreement, Security Life ceded 75% of its liability to the reinsurers. Security Life's liability included, but was not limited to, all policy death benefits, cash value amounts and premium refunds.

**ANSWER**      The allegations in Paragraph 33 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are the best evidence of their contents and deny the remaining allegations in Paragraph 33 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of

the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family

Agreement.

34.     Article II of the 1997 Reinsurance Agreement provides that "[t]he liability of the Reinsurer shall begin automatically, simultaneously with that of the Ceding Company [Security Life] under the Reinsured Policies regardless of the receipt of the reinsurance premiums by the Reinsurer if the Ceding Company has not received the insurance premiums from the producers of the Reinsured Policies. *It is the intention of this Agreement that the Reinsurer follows the fortunes of the Ceding Company in all respects.*" (Emphasis added.) Substantially the same language is contained in Article II of the 1994 Reinsurance Agreement and in Article II of the Sierra Family Agreement.

**ANSWER**     The allegations in Paragraph 34 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 1994

Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are

the best evidence of their contents and deny the remaining allegations in Paragraph 34 to the

extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of

the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family

Agreement.

35.     In exchange for Family Heritage and Sierra Family taking a percentage of the risk of the policies issued under the Insurance Program, Security Life agreed to pay the reinsurers the same percentage of the net written premiums (meaning gross premiums written, less refunded premiums) for the program. Security Life was to deduct from those premiums owed: all agents and brokers commissions and other compensation paid relative to the policies in the Insurance Program; all claims paid and allocated claim expense paid; all taxes, federal guaranty association assessments and similar assessments on the policies in the program; an agreed upon ceding fee due to Security Life; any special expenses, interest, damage or penalty incurred relative to the Insurance Program; and any amounts owed to Security Life from the producers of any of the policies in the Insurance Program.

**ANSWER**     The allegations in Paragraph 35 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 1994

Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are

the best evidence of their contents and deny the remaining allegations in Paragraph 35 to the

extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement.

36.     To meet statutory accounting and other regulatory requirements, Security Life was required to establish that there was adequate security available to ensure that Family Heritage would satisfy its obligations under the Reinsurance Agreements. In the absence of such security, Security Life could not take credit for the reinsurance and its surplus would be negatively impacted.

**ANSWER**     The allegations in Paragraph 36 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are the best evidence of their contents and deny the remaining allegations in Paragraph 36 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement.

37.     To establish security for Family Heritage's performance of its obligations, the parties entered into a Funds Withheld and Investment Management Agreement, which was attached as Exhibit A to the Reinsurance Agreement (the "Funds Withheld Agreement") (part of **Exhibit C** to this Complaint).

**ANSWER**     The allegations in Paragraph 37 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Funds Withheld Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 37 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Funds Withheld Agreement.

38.     Buchheim signed the Funds Withheld Agreement on behalf of Family Heritage.

**ANSWER**     The allegations of Paragraph 38 are admitted.

39.    Paragraph I of the Funds Withheld Agreement provides:

In lieu of creating a trust to hold the reserves on the Reinsured Policies, [Family Heritage] agrees to provide funds to [Security Life] in an amount equal to the mortality reserve on life insurance, which [Security Life] would otherwise maintain upon the Reinsured Policies, plus an amount equal to the reserves which would otherwise be maintained by [Security Life] for claims incurred but unreported and claims reported but unpaid (hereinafter the "Required Reserves"). [Security Life] shall determine the amount of the Required Reserves and its determination shall be conclusive and accepted by [Family Heritage]. [Family Heritage] shall establish the Reserves in its accounting records in the same amount that [Security Life] takes reinsurance credit for in its accounting records.

**ANSWER**    The allegations in Paragraph 39 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Funds Withheld Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 39 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Funds Withheld Agreement.

40.    The Funds Withheld Agreement provided that Security Life would withhold from all amounts due to Family Heritage an amount equal to the Required Reserves (as defined in paragraph 1 of the Funds Withheld Agreement). Those funds would be placed in a Funds Withheld Account, which would be held as a reserve against liabilities for the Insurance Program.

**ANSWER**    The allegations in Paragraph 40 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the Funds Withheld Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 40 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Funds Withheld Agreement.

41.    Although the 1994 Reinsurance Agreement and the Sierra Family Agreement do not have a Funds Withheld Agreement, the parties agreed and at all times treated the Sierra Family portion of the business and the Family Heritage portion (under both the 1994 and 1997 Agreements) as one program. Accordingly, premiums relating to policies reinsured by Sierra Family, along with premiums for all policies reinsured by Family Heritage under either the 1994

or the 1997 Reinsurance Agreements, were placed in the funds withheld account for the Family Heritage Reinsurance Program.

**ANSWER**      Defendants deny the allegations in Paragraph 41, but admit that premiums

relating to policies reinsured by Sierra Family and Family Heritage were placed in one account.

### Lack of Distinction Between SRI PORCs; SRI and SRI PORC Involvement in Family Heritage Reinsurance Program

42.      Smith and SRI brought the Family Heritage Reinsurance Program to Security Life and proposed that the program be structured in the first instance with Family Heritage as Reinsurer and SRI as Administrator. SRI provided the agents to sell policies in the Insurance Program and negotiated Managing Producer Agreements on Security Life's behalf with the primary agents selling policies for the Insurance Program.

**ANSWER**      Defendants deny the allegations in Paragraph 42, but admit that SRI

negotiated Managing Producer Agreements with agents selling policies.

43.      At all times, all of Security Life's communications regarding the Family Heritage Reinsurance Program were through SRI and/or Smith. Although various entities and individuals were identified by SRI as having ownership interests in the various SRI PORCs, and those PORCs were identified at various points in time as participants in the Family Heritage Reinsurance Program, Security Life's dealings were at all times with SRI.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 43 and therefore deny these allegations and demand

strict proof of these allegations.

44.      Security Life understood, and was led by SRI and Smith to believe, that SRI and/or Smith or their affiliates owned and controlled all of the PORCs that had any involvement in the Family Heritage Reinsurance Program. SRI and Smith treated the PORCs as interchangeable and as indistinguishable from SRI, and did not provide notice or explanation to Security Life when an entity's involvement in the Family Heritage Reinsurance Program ended, another began or any other aspect of the PORCs' participation changed.

**ANSWER**      Defendants deny the allegations in Paragraph 44.

45.      At some time between 2000 and 2002, Security Life became aware that Libre, another SRI PORC, had involvement in the Family Heritage Reinsurance Program. Security Life

was not aware whether or how Libre had succeeded Family Heritage and/or Sierra Life, and its communications continued to be exclusively through representatives of SRI.

**ANSWER**     Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 45 and therefore deny these allegations and demand

strict proof of these allegations.

46.     In or about 2005, Security Life heard of Ideal for the first time, when SRI made that PORC the grantor of a trust established to secure Family Heritage's and/or Libre's performance under the Reinsurance Agreements.

**ANSWER**     Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 46 regarding what Security Life heard in or about

2005 and therefore deny these allegations and demand strict proof of these allegations.

Defendants deny the remaining allegations in Paragraph 46, but admit that Ideal was the grantor

of a trust.

47.     SRI notified Security Life in late 2010 that Family Heritage was "terminated in 2006." Security Life had no prior notice of such "termination."

**ANSWER**     Defendants deny the allegations in Paragraph 47.

48.     For purposes of this Complaint, Family Heritage, Sierra Family, Ideal, Libre, SRI, Smith, XYZ Corporation and Jane Does 1-10 are referred to collectively as the "SRI Defendants."

**ANSWER**     Defendants deny the allegations in Paragraph 48. Defendants object to the

use of the term "SRI Defendants" to refer collectively to all of the defendants in this litigation.

### *Reserve Deficiency; SRI Provides Letters of Credit*

49.     From very early in the administration of the Family Heritage Reinsurance Program, the funds held by Security Life under the Funds Withheld Agreement were insufficient to cover the Required Reserves as defined by the Reinsurance Agreements. The Funds Withheld Agreement provided that, under such circumstances, Security Life could recover any deficiency amount through a fee as provided in Article X of the 1997 Reinsurance Agreement. That Article provides:

> To compensate the Ceding Company for any surplus strain arising from a deficiency in the Required Reserves, the Reinsurer shall pay the Ceding company a fee equal to the actual amount charged for surplus strain. This fee shall be calculated quarterly and paid by the reinsurer upon receipt of a statement from the Ceding Company showing the amount due.

**ANSWER**     The allegations in Paragraph 49 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 1997 Reinsurance Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 49 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 1997 Reinsurance Agreement. Answering further, Defendants admit that when the funds withheld account was first established, the amounts held in it were insufficient to meet Required Reserves in the early stages of the program.

50.     By late 1999, Security Life had notified Family Heritage, through SRI, that the Funds Withheld Account was insufficient to cover the liabilities of the Insurance Program and that Family Heritage would have to provide additional security for the program to avoid further strain on Security Life's surplus and to meet accounting requirements for the program.

**ANSWER**     Defendants deny the allegations in Paragraph 50.

51.     In response to Security Life's demands for additional security for the Reinsurers' performance of their obligations under the Reinsurance Agreements, SRI arranged for Libre, another SRI PORC, to provide a Letter of Credit, with Security Life as beneficiary, for required reserves beyond those held in the Funds Withheld Account. Security Life accepted the Letter of Credit in lieu of the fee provided for in Article X of the 1997 Reinsurance Agreement. The Letter of Credit was renewed annually for several years.

**ANSWER**     Defendants deny the allegations in Paragraph 51, but admit that Libre provided a Letter of Credit, and that the Letter of Credit was renewed annually for several years. Answering further, Defendants state that the Letter of Credit is the best evidence of its contents and deny the remaining allegations in Paragraph 51 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Letter of Credit.

52.     Security Life paid an annual fee for the Letters of Credit. SRI billed Security Life quarterly for the Letter of Credit Fee. As of 2005, the last year during which a Letter of Credit was in place to secure the SRI Defendants' obligations, that fee was $20,000 per quarter.

**ANSWER**     Defendants deny the allegations in Paragraph 52, but admit that SRI billed

Security Life $20,000 per quarter.

### SRI Proposes Trust Agreement to Replace Letters of Credit; The 2005 Trust Agreement

53.     In early 2005, SRI contacted Security Life about the annual renewal of the Letter of Credit. SRI stated that, although it was in the process of replacing the existing Letter of Credit, SRI wanted to know if Security Life would accept a trust account at INA for the benefit of Security Life, in lieu of a new Letter of Credit. Security Life indicated a willingness to consider a trust agreement in lieu of the Letter of Credit, but wanted more information about INA. SRI reassured Security Life about INA, explaining that INA was a division of ACE Limited, an international insurance and reinsurance group.

**ANSWER**     Defendants deny the allegations in Paragraph 53.

54.     Eventually, SRI and Security Life agreed that, rather than replacing the then-existing Letter of Credit, Family Heritage would transfer sufficient funds into a trust account to secure payment of Family Heritage's obligations under the Reinsurance Agreement.

**ANSWER**     Defendants deny the allegations in Paragraph 54, but admit that a trust

account was created. Answering further, Defendants state that the Trust Agreement is the best

evidence of its contents and deny the remaining allegations in Paragraph 54 to the extent that

they are inconsistent with, mischaracterizations of, or misstatements of the contents of the Trust

Agreement.

55.     On information and belief, Family Heritage did not have sufficient funds to establish the proposed trust agreement. Security Life is not aware of why Libre, which had provided the Letters of Credit, was not involved in the trust agreement. SRI arranged to have yet another of its PORCs, Ideal, fund the trust account as the grantor under the proposed trust agreement.

**ANSWER**     Defendants deny the allegations in Paragraph 55, but admit that Ideal was

the grantor under the Trust Agreement.

56.     Security Life, Ideal and INA entered into a Trust Agreement in or about May of 2005 (the "2005 Trust Agreement"), a true and correct copy of which is attached as Exhibit F to this Complaint.

**ANSWER**     The allegations in Paragraph 56 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 56 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

57.     Under the 2005 Trust Agreement, Ideal, as Grantor, agreed to place in trust sufficient funds to secure payment of up to $1,000,000 in reinsured claims and expenses due from Family Heritage to Security Life under the Security Life/Family Heritage Reinsurance Agreement.

**ANSWER**     The allegations in Paragraph 57 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 57 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

58.     INA is the Trustee of funds deposited under the 2005 Trust Agreement.

**ANSWER**     The allegations in Paragraph 58 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 58 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

59.     Security Life is the Beneficiary of the 2005 Trust Agreement.

**ANSWER**      The allegations in Paragraph 59 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 59 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

60.      The 2005 Trust Agreement expressly provides that INA will hold assets in trust under the agreement "for the sole use and benefit of the Beneficiary," Security Life.

**ANSWER**      The allegations in Paragraph 60 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 60 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

61.      Section 1(a) of the 2005 Trust Agreement provides, in pertinent part:

> The Grantor shall establish the Trust Account and the Trustee shall administer the Trust Account in its name as Trustee *for the sole use and benefit of the Beneficiary*. The Trust Account shall be subject to withdrawal by the Beneficiary solely as provided herein...

(Emphasis added.) The Trust Account was an account established at INA, Account No. MC4677 (the "INA Trust Account").

**ANSWER**      The allegations in Paragraph 61 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 61 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

62.     Numerous other provisions of the 2005 Trust Agreement place sole control of the assets in trust in the hands of Security Life. Among other provisions, the agreement provides that

(a)     All assets transferred to the INA Trust Account were to be in such form that Security Life could, and INA must at Security Life's direction, negotiate any such assets without consent or signature from Ideal or any other person;

(b)     Security Life had the right, "at any time and from time to time," to withdraw assets from the INA Trust Account upon written notice to INA, without obligation to provide any other statement or document, other than the written notice, in order to make such a withdrawal. INA was obligated to "immediately take any and all steps necessary to transfer the Assets specified" upon receipt of a notice of withdrawal from Security Life.

(c)     INA was obligated to notify Security Life in writing of each deposit to or withdrawal from the INA Trust Account.

**ANSWER**     The allegations in Paragraph 62 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 2005

Trust Agreement is the best evidence of its contents and deny the remaining allegations in

Paragraph 62 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the 2005 Trust Agreement.


63.     The 2005 Trust Agreement expressly provides that "in the absence of a Withdrawal Notice the Trustee *shall allow no substitution or withdrawal of any Asset from the Trust Account*." (Emphasis added.)

**ANSWER**     The allegations in Paragraph 63 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 2005

Trust Agreement is the best evidence of its contents and deny the remaining allegations in

Paragraph 63 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the 2005 Trust Agreement.


64.     The 2005 Trust Agreement could only be terminated after either Security Life or Ideal gave written notice of intention to terminate to INA, and after INA in turn gave written notification to both Security Life and Ideal. Transfer of assets out of the INA Trust Account, upon termination of the agreement, was allowed only upon receipt of Security Life's written approval of the termination of the 2005 Trust Agreement.

**ANSWER**      The allegations in Paragraph 64 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 64 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

65.      The 2005 Trust Agreement replaced the Letters of Credit previously provided annually by Libre.

**ANSWER**      The allegations in Paragraph 65 are admitted.

66.      Despite the fact that the SRI Defendants were no longer providing Letters of Credit after the 2005 Trust Agreement was put in place, SRI continued to fraudulently bill Security Life $20,000 per quarter until at least January 2011.

**ANSWER**      Defendants deny the allegations in Paragraph 66, but admit that SRI billed Security Life $20,000 per quarter until at least January 2011.

*SRI's Improper Transfer of Trust Assets to Fifth Third;*
*SRI's Representations to Security Life about Trust Assets*

67.      After April of 2006, Security Life stopped receiving statements for the INA Trust Account from INA.

**ANSWER**      Defendants state that they are without sufficient information or knowledge to admit or deny the allegations in Paragraph 67 and therefore deny these allegations and demand strict proof of these allegations.

68.      Security Life contacted INA to inquire about the INA Trust Account and to get statements for the account past April 2006. INA responded that the account had been closed since the end of June 2006. INA informed Security Life that the INA Trust Account was one of a large number of accounts that were transferred to Fifth Third Bank.

**ANSWER**      Defendants state that they are without sufficient information or knowledge to admit or deny the allegations in Paragraph 68 and therefore deny these allegations and demand strict proof of these allegations.

69.      SRI confirmed to Security Life that the funds had been transferred to Fifth Third. SRI told Security Life that it would send monthly statements for the Fifth Third account to Security Life going forward.

**ANSWER**      The allegations in Paragraph 69 are admitted.

70.      In November 2006, Security Life began receiving monthly statements from SRI for a Fifth Third trust account number 44-44-000-6379606 (the "Fifth Third Trust Account").

**ANSWER**      Defendants deny the allegations in Paragraph 70, but admit that in late 2006, Security Life began receiving monthly statements from SRI for a Fifth Third trust account number 44-44-000-6379606.

71.      Based on its conversations with INA and SRI, Security Life understood that Fifth Third was a successor trustee to INA under the 2005 Trust Agreement. Security Life further understood, and was led by SRI to believe, that the assets that had previously been in the INA Trust Account were still being held for the benefit of Security Life by Fifth Third, pursuant to the 2005 Trust Agreement.

**ANSWER**      Defendants deny the allegations in Paragraph 71 that SRI led Security Life to believe that the assets that had previously been in the INA Trust Account were still being held for the benefit of Security Life by Fifth Third, pursuant to the 2005 Trust Agreement. Defendants state that they are without sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 71 and therefore deny these allegations and demand strict proof of these allegations.

72.      SRI sent Fifth Third's account statements to Security Life for the entire period from 2006 through February 2011 and actively led Security Life to believe that the trust assets were still being handled consistent with the 2005 Trust Agreement for the benefit of Security Life as Beneficiary. SRI's actions and representations constitute an acknowledgment of Security

Life's rights as Beneficiary under the 2005 Trust Agreement and/or, on information and belief, were intended by SRI to conceal its improper transfer of assets from the INA Trust Account to the Fifth Third Trust Account.

**ANSWER**      Defendants deny the allegations in Paragraph 72, but admit that SRI sent

Fifth Third's account statements to Security Life for the period 2006 through February 2011.

73.      The last statement Security Life received for the INA Trust Account was for the period April 1-30, 2006. As of April 30, 2006, the value of the assets in the INA Trust Account was $1,142,422.96.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in the first sentence of Paragraph 73 and therefore deny these

allegations and demand strict proof of these allegations. The allegations in the second sentence

of Paragraph 73 are admitted.

74.      At no time did Security Life request, direct or authorize the withdrawal of funds from the INA Trust Account, nor did Security Life ever approve the termination of the 2005 Trust Agreement.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 74 and therefore deny these allegations and demand

strict proof of these allegations.

75.      On or about March 1, 2011, Security Life became concerned that, contrary to its understanding since 2006, the assets held in trust by Fifth Third were not being held for the benefit of Security Life, or that the assets were not otherwise being handled consistent with the 2005 Trust Agreement.

**ANSWER**      Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 75 and therefore deny these allegations and demand

strict proof of these allegations.

76.      On March 2, 2011, Security Life contacted Fifth Third to confirm that the assets in that account were being held for the benefit of Security Life pursuant to the 2005 Trust

Agreement. Fifth Third advised Security Life that information regarding the Fifth Third Trust Account was not accessible by Security Life because Security Life did not appear on the account.

**ANSWER**   Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 76 and therefore deny these allegations and demand

strict proof of these allegations.

77.   On or about March 3, 2011, Security Life contacted SRI to advise it of the problem with the Trust Account. On or about March 4, 2011, SRI, acting on behalf of Ideal, gave Fifth Third authority to discuss the Fifth Third Trust Account with Security Life.

**ANSWER**   Defendants deny the allegations in Paragraph 77, but admit that Security

Life contacted SRI on or about March 3, 2011, and that Ideal gave Fifth Third authority to

discuss the Fifth Third Trust Account with Security Life on or about March 4, 2011.

78.   In a series of exchanges in early March 2011, Security Life contacted Fifth Third to determine how the trust assets that were subject to the 2005 Trust Agreement came to be transferred from INA to Fifth Third and to demand that the trust assets be preserved for the benefit of Security Life. During those exchanges, Fifth Third confirmed to Security Life that the funds used to establish the Fifth Third Trust Account were transferred directly from the INA Trust Account to the Fifth Third Trust Account.

**ANSWER**   Defendants deny the allegations in Paragraph 78, but admit that Security

Life contacted Fifth Third in March 2011. Answering further, Defendants state that they are

without sufficient information or knowledge to admit or deny the allegations in Paragraph 78 that

Fifth Third confirmed to Security Life that the funds used to establish the Fifth Third Trust

Account were transferred directly from the INA Trust Account to the Fifth Third Trust Account

and therefore deny these allegations and demand strict proof of these allegations.

79.   At some point during these conversations with Fifth Third and SRI, Security Life became aware that the assets held in trust at Fifth Third, which had been directly transferred from the INA Trust Account held for the benefit of Security Life, were being held at Fifth Third under a 2006 Trust Agreement, to which Security Life was not a party. A true and correct copy of the 2006 Trust Agreement is attached to this Complaint as **Exhibit G**.

**ANSWER**     Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 79 that Security Life became aware that the assets

held in trust at Fifth Third, which had been directly transferred from the INA Trust Account held

for the benefit of Security Life, were being held at Fifth Third under a 2006 Trust Agreement, to

which Security Life was not a party and therefore deny these allegations and demand strict proof

of these allegations. Answering further, Defendants admit that Exhibit G is a true and correct

copy of a trust agreement, but deny that the assets transferred from the INA Trust Account were

being held at Fifth Third under Exhibit G.

80.     The 2006 Trust Agreement is between Ideal as Grantor, Fifth Third as Trustee,
and an SRI-affiliated company called First Automotive Risk Retention Group, Inc. ("First
Automotive"), as Beneficiary. Security Life is not mentioned in the 2006 Trust Agreement and
had no knowledge of that agreement, or the removal of Security Life as the Beneficiary of the
trust assets, until March 2011.

**ANSWER**     The allegations in Paragraph 80 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that Exhibit G

is the best evidence of its contents and deny the remaining allegations in Paragraph 80 to the

extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of

Exhibit G. Answering further, Defendants state that they are without sufficient information or

knowledge to admit or deny the allegations in Paragraph 80 that Security Life had no knowledge

of that agreement, or the removal of Security Life as the Beneficiary of the trust assets, until

March 2011 and therefore deny these allegations and demand strict proof of these allegations.

81.     Smith signed the 2006 Trust Agreement as President of both Ideal and First
Automotive.

**ANSWER**     Defendants deny the allegations in Paragraph 81, but admit that Smith

signed Exhibit G as President of Ideal and as President of First Automotive.

82.     On March 15, 2011, Security Life met with representatives of SRI to determine how the assets came to be transferred from INA to Fifth Third and to demand a revised Trust Agreement, including Security Life as Beneficiary, consistent with the 2005 Trust Agreement, by March 31, 2011. SRI acknowledged that a mistake had been made, that the funds should have been held for Security Life, and agreed to work to correct it as quickly as possible.

**ANSWER**     Defendants deny the allegations in Paragraph 82, but admit that on March 15, 2011, Security Life met with representatives of SRI.

83.     On March 17, 2011, Security Life contacted SRI to inquire as to the status of SRI's efforts to restore the 2005 Trust Agreement.

**ANSWER**     Defendants deny the allegations in Paragraph 83, but admit that on March 17, 2011 Security Life contacted Southwest Re.

84.     On March 17, 2011, Security Life wrote to Fifth Third to advise Fifth Third that: (a) Security Life had confirmed that the funds in the Fifth Third Account were taken from the INA Trust Account; and (b) that Ideal and SRI had acknowledged the error and agreed to work on a plan for correcting it. Security Life asked Fifth Third not to process any distributions from (or changes to) the Fifth Third Trust Account without the consent of Security Life.

**ANSWER**     Defendants deny the allegations in Paragraph 84, but admit that on March 17, 2011 Security Life wrote to Fifth Third.

85.     On or about March 30, 2011, Security Life contacted Fifth Third once again to reiterate that it had a valid legal claim to the assets being held in the Fifth Third Trust Account. Security Life once again requested that Fifth Third not permit any distributions or withdrawals from the Fifth Third Trust Account until Security Life was able to resolve its issues with Ideal/SRI and enter into a mutually acceptable plan for the handling of the assets held in trust.

**ANSWER**     Defendants deny the allegations in Paragraph 85, but admit that on or about March 30, 2011 Security Life contacted Fifth Third.

86.     On information and belief, based on the most recent statements received by Security Life relating to the Fifth Third Trust Account, the assets in that account had a value of $1,276,767 as of February 28, 2011.

**ANSWER**     The allegations in Paragraph 86 are admitted.

87.     Late in the day on April 1, 2011, Fifth Third notified Security Life, through its counsel, that a distribution request had been made, apparently by SRI on behalf of Ideal and/or on behalf of First Automotive, and that all assets held in the Fifth Third Trust Account had been distributed.

**ANSWER**     Defendants state that they are without sufficient information or knowledge

to admit or deny the allegations in Paragraph 87 and therefore deny these allegations and demand

strict proof of these allegations.

88.     As a result of the loss of the assets held in trust, Security Life's statutory capital and surplus suffered an immediate decline of at least $1,275,715 as of December 31, 2010. This decline may result in adverse regulatory action and may have a deleterious impact on Security Life's A.M Best rating. These developments would significantly impair Security Life's ability to produce new business and potentially impair its ability to retain in-force business.

**ANSWER**     The allegations in Paragraph 88 are legal conclusions as to which no

response is required and are therefore denied.

### COUNT I: PIERCING CORPORATE VEIL AS TO SRI AND SRI PORCs

89.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

90.     SRI approached Security Life to propose the creation of the Family Heritage Reinsurance Program. All communications regarding all aspects of the Insurance Program and the Family Heritage Reinsurance Program were between Security Life and SRI.

**ANSWER**     Defendants deny the allegations in Paragraph 90.

91.     SRI has at all times treated the PORCs, or producer-owned reinsurance companies, that it owns and/or operates as interchangeable entities that are indistinguishable from SRI.

**ANSWER**     Defendants deny the allegations in Paragraph 91.

92.     There is no meaningful distinction between the SRI Defendants, including SRI, Family Heritage, Sierra Family, Libre and Ideal, as well as XYZ Corporation and Jane Does 1-10. On information and belief:

(a)     Family Heritage, Sierra Family, Libre and Ideal are all insufficiently capitalized for purposes of their corporate undertakings;

(b)     The SRI Defendants, including SRI and its PORCs, have failed to observe corporate formalities between and among themselves;

(c)     Family Heritage, Sierra Family, Libre and Ideal have, at times relevant to this complaint, been insolvent;

(d)     SRI has commingled funds between and among the other SRI Defendants;

(e)     Family Heritage, Sierra Family, Libre and Ideal have not had functioning officers and directors independent of SRI; and

(f)     Family Heritage, Sierra Family, Libre and Ideal do not have corporate records separate and apart from SRI.

**ANSWER**     Defendants state that they are without sufficient information or knowledge to admit or deny the following allegations in Paragraph 92 and therefore deny these allegations and demand strict proof of these allegations:  that Family Heritage, Sierra Family and Libre are all insufficiently capitalized for purposes of their corporate undertakings; that Family Heritage, Sierra Family and Libre have, at times relevant to this complaint, been insolvent. Defendants deny the remaining allegations in Paragraph 92.

93.     On information and belief, Family Heritage, Sierra Family, Libre and Ideal have not had independence from SRI and/or Smith, and to the contrary have been operated as alter egos for the dealings of SRI and/or Smith.

**ANSWER**     Defendants deny the allegations in Paragraph 93.

94.     The corporate veil should be pierced with respect to Family Heritage, Sierra Family, Libre and Ideal and SRI and/or Smith.

**ANSWER**     The allegations in Paragraph 94 are legal conclusions as to which no response is required and are therefore denied.

**COUNT II: DECLARATORY JUDGMENT - ALTER EGO LIABILITY**

95.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

96.     Family Heritage, Sierra Family, Libre and Ideal were and continue to be controlled by principals of each other, by Smith and/or by SRI, to the extent that they have independence, it is in form only.

**ANSWER**     Defendants deny the allegations in Paragraph 96.

97.     Smith and SRI used the corporate identities of Family Heritage, Sierra Family, Libre and Ideal as a subterfuge to justify wrongdoing and to perpetuate a fraud on Security Life.

**ANSWER**     Defendants deny the allegations in Paragraph 97.

98.     As a result of the SRI Defendants' actions, Plaintiff is entitled to a declaration that Family Heritage, Sierra Family, Ideal and Libre are alter egos of one another and/or of SRI.

**ANSWER**     Defendants deny the allegations in Paragraph 98.

**COUNT III: BREACH OF REINSURANCE AGREEMENTS
AND FUNDS WITHHELD AGREEMENT**

99.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 99.

100.    The 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are binding agreements between Security Life, Family Heritage and Sierra Family.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 100.

101.     Security Life satisfied all of its obligations under the Reinsurance Agreements.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 101.

102.     Libre and Ideal undertook some or all of the obligations of Family Heritage and Sierra Family under the Family Heritage Reinsurance Program.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 102.

103.     The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 103.

104.     The SRI Defendants' actions, as described above, constitute breaches of the Reinsurance Agreement, including the Funds Withheld Agreement that forms a significant part of the parties' relationship. The SRI Defendants' breaches include, but are not limited to:

(a)     Failure to provide funds sufficient to avoid a deficiency in reserves required for the Insurance Program;

(b)     Failure to pay amounts due to Security Life under the Reinsurance Agreements;

(c)     Failure to timely and accurately report on the reserves for the policies included in the Insurance Program;

(d)     Refusing Security Life's demands for the establishment of reserves sufficient to cover liabilities for the ceded portion of the Insurance Program; and

(e)     Failure to inform Security Life of the insolvency, termination or inability to perform of Family Heritage and other SRI Defendant entities.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 104.

105.    As a direct and proximate result of the multiple breaches of the Reinsurance Agreements by the SRI Defendants, Security Life has suffered significant damage, in an amount in excess of $75,000 to be proven at trial.

**ANSWER**     Count III is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 105.

**COUNT IV: BREACH OF 2005 TRUST AGREEMENT**

106.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

107.    The 2005 Trust Agreement was a binding agreement among Security Life, Ideal and INA.

**ANSWER**     The allegations in Paragraph 107 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 2005

Trust Agreement is the best evidence of its contents and deny the remaining allegations in

Paragraph 107 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the 2005 Trust Agreement.

108.    Security Life satisfied any obligation it had under the 2005 Trust Agreement.

**ANSWER**    The allegations in Paragraph 108 are legal conclusions as to which no response is required and are therefore denied. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 108 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

109.    By the actions described above, Ideal breached its duties as Grantor under the 2005 Trust Agreement.

**ANSWER**    Defendants deny the allegations in Paragraph 109.

110.    The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program.

**ANSWER**    Defendants deny the allegations in Paragraph 110.

111.    By the actions described above, INA and/or its successors in interest breached their duties as Trustee under the 2005 Trust Agreement.

**ANSWER**    The allegations in Paragraph 111 are not directed towards Defendants and therefore Defendants make no answer to them.

112.    As a direct and proximate result of the breaches by the SRI Defendants and INA, Security Life has suffered significant damage in an amount in excess of $75,000 to be proven at trial.

**ANSWER**    Defendants deny the allegations in Paragraph 112.

113.    The harm caused by the breaches by the SRI Defendants and INA will continue unless Defendants are enjoined from handling the assets placed in trust in any manner inconsistent with the 2005 Trust Agreement.

**ANSWER**    Defendants deny the allegations in Paragraph 113.

## COUNT V: BREACH OF THE ADMINISTRATION AGREEMENT

114.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

115.     SRI and Security Life entered into the Administration Agreement, which is a valid and binding contract between them.

**ANSWER**     The allegations in Paragraph 115 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the

Administration Agreement is the best evidence of its contents and deny the remaining allegations

in Paragraph 115 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the Administration Agreement.

116.     Security Life has satisfied its obligations under the Administration Agreement.

**ANSWER**     The allegations in Paragraph 116 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the

Administration Agreement is the best evidence of its contents and deny the remaining allegations

in Paragraph 116 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the Administration Agreement.

117.     SRI has breached the Administration Agreement in numerous ways, including but not limited to:

(a)     Failure to terminate policies timely for lack of premium payments by insureds, resulting in overstatement of premium;

(b)     Failure to seek collection of amounts advanced to agents;

(c)     Payment of override commissions to producers on policies past the tenth anniversary of such policies in contravention of the provisions of the agreements;

(d)     Failure to properly escheat unclaimed property related to certain death claims on a timely basis; and

(e)     Failure to fulfill its contractual and fiduciary duties to Security Life by, among other things, transferring the INA Trust Account assets to Fifth Third and then directing the distribution of those assets out of the Fifth Third Account, and by billing Security Life $20,000 per quarter for Letter of Credit fees after the 2005 Trust Agreement replaced the Letters of Credit.

**ANSWER**     Defendants deny the allegations in Paragraph 117.

118.   As a direct and proximate result of SRI's breaches of the Administration Agreement, Security Life has suffered damages in excess of $75,000 to be proven at trial.

**ANSWER**     Defendants deny the allegations in Paragraph 118.

119.   SRI's breaches of the Administration Agreement, and the consequent damage to Security Life, will continue unless enjoined.

**ANSWER**     Defendants deny the allegations in Paragraph 119.

## COUNT VI: BREACH OF FIDUCIARY DUTY

120.   Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 120.

121.   Security Life trusted and confided in the SRI Defendants generally with respect to the Insurance Program and the Family Heritage Reinsurance Program. Under the circumstances, the SRI Defendants were all required to act for the benefit of Security Life in all matters relating to their relationships with Security Life.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 121.

122.     SRI owed Security Life a fiduciary duty as Administrator of the Insurance Program.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 122.

123.     Family Heritage and its successors and alter egos, including the SRI Defendants, owed Security Life fiduciary duties as reinsurers under the Reinsurance Agreements.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 123.

124.     Ideal, and its successors and alter egos including the SRI Defendants, owed Security Life a fiduciary duty as the grantor under the 2005 Trust Agreement.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 124.

125.     The SRI Defendants owed Security Life fiduciary duties per se, or undertook de facto fiduciary obligations to Security Life.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 125.

126.     By the actions described above, the SRI Defendants breached their fiduciary duties to Security Life.

**ANSWER**     Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 126.

127.    As a direct and proximate result of the SRI Defendants' multiple breaches of fiduciary duty, Security Life has suffered damages in excess of $75,000 to be proven at trial.

**ANSWER**    Count VI is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 127.

## COUNT VII: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

128.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**    Defendants restate their answers to the previous allegations of the Complaint as if fully set forth herein.

129.    The SRI Defendants, INA and INA's successors or assigns, owed Security Life a common law duty of good faith and fair dealing.

**ANSWER**    The allegations in Paragraph 129 are legal conclusions as to which no response is required and are therefore denied.

130.    By their actions described above, Defendants have breached their duty of good faith and fair dealing by acting dishonestly and unreasonably toward Security Life.

**ANSWER**    Defendants deny the allegations in Paragraph 130.

131.    As a direct and proximate result of Defendants' actions, Security Life has suffered damages in excess of $75,000 to be proven at trial.

**ANSWER**    Defendants deny the allegations in Paragraph 131.

## COUNT VIII: FRAUD

132.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 132.

133.      Smith and the other SRI Defendants made false representations to Security Life, including but not limited to the following:

(a)      The SRI Defendants failed to disclose to Security Life that, in or about April 2006, they arranged for the transfer of trust assets in the INA Trust Account and the effective termination of the 2005 Trust Agreement.

(b)      The SRI Defendants established the 2006 Trust Agreement and Fifth Third Trust Account, eliminating Security Life as a beneficiary of the trust assets, without notifying Security Life.

(c)      The SRI Defendants attempted to conceal their wrongful transfer of the trust assets from the INA Trust Account to the Fifth Third Trust Account, and their fraudulent termination of the 2005 Trust Agreement and establishment of the 2006 Trust Agreement, by representing to Security Life in late 2006 that the funds were still being held in trust for the benefit of Security Life and sending Security Life statements for the Fifth Third Trust Account from late 2006 to early 2011.

(d)      The SRI Defendants represented to Security Life in March 2011 that the funds in the Fifth Third Trust Account were being held for the benefit of Security Life, when in fact they were not.

(e)      Immediately after representing to Security Life that the assets in the Fifth Third Trust Account were being held for the benefit of Security Life, the SRI Defendants directed that those assets be distributed out of the Fifth Third Trust Account, without notice to Security Life and in direct contravention of Security Life's contemporaneous assurances.

(f)      The SRI Defendants, and SRI specifically, submitted fraudulent bills to Security Life continuously from approximately April 2005 through at least January 2011, for quarterly Letter of Credit fees of $20,000, for Letters of Credit that were no longer in place for the benefit of Security Life.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 133.

134.      Defendants' misrepresentations related to past or existing material facts that were susceptible of knowledge by Defendants.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 143.

135.     Defendants made the misrepresentations to Security Life knowing of their falsity or, in the alternative, made the misrepresentations to Security Life without knowing whether those representations were true or false.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 135.

136.     Defendants made the misrepresentations to Security Life with the intention of inducing Security Life to act in reliance on those misrepresentations.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 136.

137.     Defendants' misrepresentations caused Security Life to act in reliance on those misrepresentations.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 137.

138.     As a direct and proximate result of Defendants' misrepresentations, Security Life has suffered damages in excess of $75,000 to be proven at trial.

**ANSWER**      Count VIII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 138.

## COUNT IX: CONVERSION

139.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Count IX is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 139.

140.     Security Life has a property interest in the assets that were placed in trust under the 2005 Trust Agreement, including an interest in any interest earned on such assets while they have been held in trust.

**ANSWER**     Count IX is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 140.

141.     The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

**ANSWER**     Count IX is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 141.

142.     The SRI Defendants, through their actions in transferring trust assets from the INA Trust Account to the Fifth Third Trust Account, and then in directing that the trust assets be distributed out of the Fifth Third Trust Account, have deprived Security Life of its interest in the trust assets.

**ANSWER**     Count IX is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 142.

143.     As a direct and proximate result of the SRI Defendants' actions, Security Life has suffered damages in excess of $75,000 to be proven at trial.

**ANSWER**     Count IX is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 143.

## COUNT X: UNJUST ENRICHMENT

144.     Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**     Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

145.     Security Life entered into a 2005 Trust Agreement with Ideal and INA to hold certain funds in trust for the benefit of Security Life.

**ANSWER**     The allegations in Paragraph 145 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 2005

Trust Agreement is the best evidence of its contents and deny the remaining allegations in

Paragraph 145 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the 2005 Trust Agreement.

146.     The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

**ANSWER**     Defendants deny the allegations in Paragraph 146.

147.     As a result of the actions of the SRI Defendants in transferring the assets of the INA Trust Account to the Fifth Third Trust Account, and then directing the distribution of those assets out of the Fifth Third Trust Account, the SRI Defendants have had a benefit conferred upon them and having knowingly accepted that benefit.

**ANSWER**     Defendants deny the allegations in Paragraph 147.

148.    The SRI Defendants' acceptance and retention of the benefits of the assets subject to the 2005 Trust Agreement would be inequitable.

**ANSWER**    Defendants deny the allegations in Paragraph 148.

149.    As a direct and proximate result of the SRI Defendants' actions, the SRI Defendants have been unjustly enriched and Security Life has been damaged in an amount in excess of $75,000 to be proven at trial.

**ANSWER**    Defendants deny the allegations in Paragraph 149.

### COUNT XI: CONSTRUCTIVE TRUST

150.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**    Defendants restate their answers to the previous allegations of the

Complaint as if fully set forth herein.

151.    Security Life entered into a 2005 Trust Agreement with Ideal and INA to hold certain funds in trust for the benefit of Security Life.

**ANSWER**    The allegations in Paragraph 151 are legal conclusions as to which no

response is required and are therefore denied. Answering further, Defendants state that the 2005

Trust Agreement is the best evidence of its contents and deny the remaining allegations in

Paragraph 151 to the extent that they are inconsistent with, mischaracterizations of, or

misstatements of the contents of the 2005 Trust Agreement.

152.    The corporate veil should be pierced as to the SRI Defendants or, in the alternative, the SRI Defendants are alter egos to one another with respect to their actions relating to the Family Heritage Reinsurance Program, including with respect to the 2005 Trust Agreement.

**ANSWER**    Defendants deny the allegations in Paragraph 152.

153.    Rather than holding the funds in trust for Security Life, the SRI Defendants and/or INA transferred the assets to Fifth Third.

**ANSWER**       Defendants deny the allegations in Paragraph 153, but admit that the assets in the INA Trust Account were transferred to Fifth Third.

154.    On information and belief, the SRI Defendants, or some of them, arranged to have the trust assets originally held in the INA Trust Account under the 2005 Trust Agreement placed under trust with Fifth Third under a new trust agreement, under which Security Life was no longer the beneficiary of the trust assets.

**ANSWER**       Defendants deny the allegations in Paragraph 154, but admit that the trust assets held in the INA Trust Account were transferred to Fifth Third. Answering further, Defendants state that the 2005 Trust Agreement is the best evidence of its contents and deny the remaining allegations in Paragraph 154 to the extent that they are inconsistent with, mischaracterizations of, or misstatements of the contents of the 2005 Trust Agreement.

155.    On information and belief, the SRI Defendants, or some of them, directed that the trust assets being held in the Fifth Third Trust Account be distributed out of that account, depriving Security Life of the benefit of those funds.

**ANSWER**       Defendants deny the allegations in Paragraph 155, but admit that Ideal authorized the transfer of the assets from the Fifth Third Trust Account.

156.    The SRI Defendants have received the benefit of Security Life's assets as beneficiary under the 2005 Trust Agreement.

**ANSWER**       Defendants deny the allegations in Paragraph 156.

157.    Security Life is entitled to have a constructive trust placed on the assets of SRI and/or the SRI Defendants in the full amount of the balance of the Fifth Third Trust Account on the date of final distribution out of that account, plus interest.

**ANSWER**       Defendants deny the allegations in Paragraph 157.

## COUNT XII: INJUNCTIVE RELIEF

158.    Security Life restates the previous allegations of this Complaint as if fully set forth herein.

**ANSWER**      Count XII is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 158.

159.    Defendants' actions have caused significant and irreparable harm to Security Life, including but not limited to an immediate decline of over $1 million in Security Life's statutory capital and surplus. As a direct and proximate result of Defendants' actions, Security Life's ability to produce new business and retain its current business is significantly impaired.

**ANSWER**      Count XII is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 159.

160.    Unless the Court grants Security Life injunctive relief, Security Life will continue to suffer significant and irreparable harm with respect to the Insurance Program, the Family Heritage Reinsurance Program, and its business generally.

**ANSWER**      Count XII is the subject of Defendants' pending Rule 12(b)(6) Motion to

Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the

allegations in Paragraph 160.

161.    Security Life is entitled to temporary, preliminary and permanent injunctive relief as to the SRI Defendants, as follows:

(a)      Requiring the SRI Defendants to cooperate in the termination and winding up of the Administrative Agreement and administration of the Insurance Program, including but not limited to transferring all files (paper and electronic) relating in any way to the Insurance Program to Security Life, arranging for the change of all email and street or P.O. Box addresses from the SRI Defendants to Security Life, and cooperating in all respects with Security Life and/or its designated agents in transferring the administration of policies in the Insurance Program from the SRI Defendants to Security Life; ,

(b)      Cooperating in all respects with the termination of the Reinsurance Agreements and, at Security Life's option, the transfer of the ceded portion of the Insurance Program to another reinsurer or reinsurers;

(c)      Such other injunctive relief as the Court deems necessary to remove the SRI Defendants from the Administration and/or reinsurance of the Insurance Program.

**ANSWER**     Count XII is the subject of Defendants' pending Rule 12(b)(6) Motion to Dismiss, filed contemporaneously with this Answer, and therefore no response is required to the allegations in Paragraph 161.

WHEREFORE, Security Life prays for an Order:

1.     Entering judgment in favor of Security Life and against Defendants for all damages proximately resulting from Defendants' actions;

2.     Entering declaratory judgment that Family Heritage, Sierra Family, Libre, and Ideal are the alter egos of one another and/or SRI.

3.     Imposing a constructive trust on Defendants' assets;

4     Granting Security Life the injunctive relief requested herein;

5.     Granting Security Life its reasonable costs and attorneys' fees in this action; and

6.     Granting such other and further relief as the Court may deem just and equitable.

**ANSWER**     Defendants deny that Security Life is entitled to the relief sought herein.

## AFFIRMATIVE DEFENSES

### Waiver and Estoppel

1.     From approximately 1999 to 2005, Southwest Reinsure, Inc. ("Southwest Re") billed Security Life Insurance Company of America ("Security Life") $20,000 each quarter as a fee for a Letter of Credit.

2.     In 2005, the Letter of Credit was replaced with the 2005 Trust Agreement. Security Life knew and understood that the Letter of Credit had been cancelled and was no longer in effect, and that the 2005 Trust Agreement replaced the Letter of Credit and fulfilled the same purpose and function as the Letter of Credit.

3.     Southwest Re continued to bill Security Life $20,000 each quarter as a fee for the 2005 Trust Agreement. Security Life paid the $20,000 quarterly fees, and never informed Southwest

Re that the $20,000 quarterly fees were not properly due and owing to Southwest Re. By accepting and paying the quarterly fees, Security Life represented to Southwest Re that they were properly due and owed to Southwest Re.

4.      Southwest Re relied on Security Life's continued acceptance and payment of the $20,000 quarterly fees by continuing to bill and collect the quarterly fees.

5.      Consequently, Security Life has waived the right to assert, and/or is estopped from asserting, that all or some of the $20,000 quarterly fees were not properly due and owing to Southwest Re.

## Account Stated

6.      The allegations in Paragraphs 1 through 5 above are restated and incorporated herein by reference.

7.      By accepting and paying the $20,000 quarterly fees, and by not contesting Southwest Re's right to bill and collect the $20,000 quarterly fees, Security Life admitted that the amounts billed were correct and were properly due and owing.

8.      Consequently, there is an account stated between Southwest Re and Security Life for the $20,000 quarterly fees, and Security Life is barred from recovering all or some of the quarterly fees accepted and paid.

## Laches

9.      The allegations in Paragraphs 1 through 8 above are restated and incorporated herein by reference.

10.     Security Life alleges that it received statements for the INA Trust Account through April 2006.

11.     The statements for the INA Trust Account stated that the account holder was "Ideal Insurance Company Trust FBO Security Life Insurance Company of America."

12.     Security Life alleges that in 2006 it discovered that the trust assets were transferred from the INA Trust Account to the Fifth Third Trust Account.

13.     According to Security Life, from October 2006 to July 2009, it received statements for the Fifth Third Trust Account indicating they were for "Fifth Third as Trustee for Ideal Insurance Company." Attached hereto as Exhibit A is a true and correct copy of an e-mail from Daniel R. Bauer, Interim Chief Financial Officer for Security Life, to Kimberly Kutlenios of Fifth Third, dated March 4, 2011.

14.     According to Security Life, beginning in July 2009 it received statements for the Fifth Third Trust Account indicating they were for "Ideal Insurance Company LTD U/A/D 8/1/06 and First Automotive Risk Retention Group Inc." *See* Ex. A.

15.     Despite the fact that on their face, the statements for the Fifth Third Trust Account did not indicate that the account was for the benefit of Security Life, Security Life accepted the statements and did not inquire as to why it was not on the account from at least October 2006 to at least March 1, 2011.

16.     Upon information and belief, Security Life knew or should have known by at least October 2006 that it was not named on the Fifth Third Trust Account, yet it made no inquiries regarding the Fifth Third Trust Account for nearly four and a half years.

17.     Consequently, the claims asserted in Security Life's Complaint are barred, in whole or in part, by the doctrine of laches.

**<u>Unclean Hands</u>**

18.     The allegations in Paragraphs 1 through 17 above are restated and incorporated herein by reference.

19.     The policies reinsured under the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement are for pre-need and final expense burial insurance, which covers the expenses of burials when the insureds die. The insureds pay premiums that eventually are used to pay the burial expenses. It is known and understood in the insurance industry that such policies have a 100% claim rate, except for policies that are cancelled or rescinded. In other words, eventually 100% of the premiums received are paid out in claims for policies still in force at the time of the insureds' deaths.

20.     Because the claim rate for these policies is at or close to 100%, it is known and understood in the insurance industry that the profitability of such policies depends on being able to invest the premiums and reinsurance premiums for a sufficient length of time, and at a sufficient rate of return, so that the total of the initial premiums received, plus the investment income, is more than the required reserves.

21.     When Security Life entered into the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement and the Sierra Family Agreement, it knew and understood that the reinsured policies had a 100% claim rate, and that eventually 100% of the premiums received would be paid out in claims for policies still in force at the time of the insureds' deaths.

22.     Security Life further knew and understood that the profitability of the policies depended on being able to invest the premiums and reinsurance premiums for a sufficient length of time, and at a sufficient rate of return, so that the total of the initial premiums received, plus the investment income, would be more than the total of the required reserves.

23.     Security Life knew and understood that, until the premiums and reinsurance premiums had been invested for a sufficient length of time and at a sufficient rate of return, the premiums received would be less than the Required Reserves.

24.     Security Life thus knew and understood that the reserves initially established for anticipated claims from the available premiums would be less than the Required Reserves for some period of time, resulting in short term surplus strain until such time as investment income made up the difference.

25.     Security Life had the sole obligation to invest and manage reinsurance premiums under the reinsurance agreements. Upon information and belief, Security Life did not properly invest or manage the reinsurance premiums received for the reinsured policies, and/or did not properly allocate income from its investments to the reinsured policies. Security Life's failure to invest, manage and/or allocate investment income was not in accord with the custom and practice in the insurance industry, and was an abuse of Security Life's discretion under the reinsurance agreements.

26.     Security Life is solely responsible for any alleged shortfall in reserves, capital and/or surplus because funds are, or may be, less than the Required Reserves.

27.     Consequently, the claims asserted in Security Life's Complaint are barred, in whole or in part, by the doctrine of unclean hands.

### Failure to Mitigate Damages

28.     The allegations in Paragraphs 1 through 28 are restated and incorporated herein by reference.

29.     The claims asserted in Security Life's Complaint are barred, in whole or in part, because Security Life failed to take reasonable action to mitigate its damages. Specifically, upon

information and belief Security Life failed to invest or manage the reinsurance premiums received for the reinsured policies, and/or did not properly allocate income from its investments to the reinsured policies.

30.     Consequently, the claims asserted in Security Life's Complaint are barred, in whole or in part, by its failure to mitigate its damages.

### Breach of Duty of Good Faith and Fair Dealing

31.     The allegations in Paragraphs 1 through 30 are restated and incorporated herein by reference.

32.     Security Life has implied duties of good faith and fair dealing under the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement, the Funds Withheld Agreement, the Sierra Family Agreement, the Administration Agreement, and the 2005 Trust Agreement. Security Life's duties of good faith and fair dealing include, but are not limited to, exercising the discretion afforded it under the contracts reasonably and in accord with insurance industry custom and practice, not unjustifiably hindering the other parties' performances under the contracts, and not frustrating the material purpose of the contracts.

33.     Security Life breached its duties of good faith and fair dealing by, upon information and belief, failing to invest or manage the reinsurance premiums received for the reinsured policies, and/or not properly allocating income from its investments to the reinsured policies.

34.     As a proximate cause of Security Life's breaches of its duties of good faith and fair dealing, the defendants have been unjustifiably hindered in their performances under the contracts, and the material purpose of the contracts has been frustrated.

35.     Consequently, the claims asserted in Security Life's Complaint are barred, in whole or in part, because Security Life breached its duties of good faith and fair dealing.

## **Breach of Fiduciary Duty**

36.     The allegations in Paragraphs 1 through 35 are restated and incorporated herein by reference.

37.     The reinsurers entrusted to Security Life their reinsurance premiums to be invested and managed so that there would be sufficient funds in excess of the required reserves. The reinsurers reposed in Security Life complete trust and confidence that Security Life would invest and manage the reinsurance premiums, and properly allocate income from its investments to the reinsured policies. Security Life knew and understood that the reinsurers were completely reliant on Security Life to invest and manage the reinsurance premiums, and properly allocate income from its investments to the reinsured policies.

38.     Security Life was in a superior position to the reinsurers, and had superior knowledge and ability, regarding the investment and management of the reinsurance premiums and the allocation of income from its investments to the reinsured policies. Security Life had a fiduciary relationship with the reinsurers, and had a fiduciary duty to invest and manage the reinsurance premiums, and properly allocate income from its investments to the reinsured policies.

39.     Consequently, the claims asserted in Security Life's Complaint are barred, in whole or in part, because Security Life breached its fiduciary duties under the 1994 Reinsurance Agreement, the 1997 Reinsurance Agreement, the Funds Withheld Agreement, and the Sierra Family Agreement.

## **Statute of Limitations**

40.     The allegations in Paragraphs 1 through 39 are restated and incorporated herein by reference.

41.     The claims asserted in Security Life's Complaint are barred, in whole or in part, by the applicable statutes of limitations.

Date:  July 15, 2011                                    Respectfully submitted,

                                                        SOUTHWEST REINSURE, INC., JAMES B.
                                                        SMITH, IDEAL INSURANCE COMPANY LTD.


                                                        By:     __/s/ Paul Walker-Bright_____
                                                                One of Its Attorneys

                                                                Paul Walker-Bright (*pro hac vice*)
                                                                REED SMITH LLP
                                                                10 South Wacker Drive, 40th Floor
                                                                Chicago, Illinois 60606
                                                                Telephone:  (312) 207-1000
                                                                Fax:     (312) 207-6400
                                                                Email:  pwalkerbright@reedsmith.com

                                                                David M. Schlecker (*pro hac vice*)
                                                                REED SMITH LLP
                                                                599 Lexington Avenue
                                                                New York, New York 10022
                                                                Telephone:  (212) 521-5400
                                                                Fax:     (212) 521-5450
                                                                Email:  dschlecker@reedsmith.com

                                                                Terrance W. Moore
                                                                Steingart, McGrath and Moore, P.A.
                                                                3300 Edinborough Way, Suite 601
                                                                Edina, MN 55435
                                                                Tel: 952-831-7100
                                                                Fax: 952-835-5959
                                                                Email: terry@steingart.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 15, 2011, I caused a true and correct copy of the foregoing Answer

and Affirmative Defenses of Defendants Southwest Reinsure, Inc., Ideal Insurance Company,

Ltd. and James B. Smith to be served via the Court's ECF system and U.S. Mail upon:

### <u>Attorneys for Security Life Insurance Company of America</u>

Robert L. Meller, Jr.
Sarah E. Crippen
Elizabeth C. Borer
BEST & FLANAGAN LLP
225 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Tel:612-339-7121
Fax: 612-339-5897
Email: rmeller@bestlaw.com
Email: scrippen@bestlaw.com
Email: eborer@bestlaw.com

### <u>Attorneys for INATrust fsb</u>

Laura J. Hanson
MEAGER & GEER, PLLP
33 S. Sixth Street, Suite 4400
Minneapolis, MN 55402
Tel:  612-338-0661
Fax:  612-338-8384
Email:  lhanson@meagher.com

Daryn E. Rush
Gibbons, PC
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2769
Tel:  215-665-0400
Fax:  215-636-0366
Email:  drush@gibbonslaw.com

By:_____/s/ Paul Walker-Bright_____
One of the Attorneys for Defendants Southwest Reinsure,
Inc., James B. Smith, Ideal Insurance Company Ltd.