## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SECURITY LIFE INSURANCE COMPANY
OF AMERICA,

       Plaintiff,

                           **MEMORANDUM OF LAW & ORDER**

v.                             Civil No. 11-1358 (MJD/JJK)

SOUTHWEST REINSURE, INC.;
JAMES B. SMITH; FAMILY HERITAGE
REINSURANCE CO., LTD.; IDEAL
INSURANCE COMPANY, LTD.; SIERRA
FAMILY LIFE REINSURANCE CO., LTD.;
LIBRE INSURANCE CO., LTD.; INA
TRUST FSB; ABC CORPORATION and
JOHN DOES 1-10; and XYZ CORPORATION
and JANE DOES 1-10,

       Defendants.

---

Elizabeth C. Borer, Robert L. Meller, Jr., and Sarah E. Crippen, Best & Flanagan
LLP, Counsel for Plaintiff.

Terrance W. Moore, Steingart, McGrath & Moore PA, David M. Schlecker and
Paul Walker-Bright, Reed Smith LLP, Counsel for Defendants Southwest
Reinsure, Inc., James B. Smith, Ideal Insurance Co., Ltd.

Laura J. Hanson and Erin D. Doran, Meagher & Geer PLLP, and Daryn E. Rush,
Gibbons, PC, Counsel for Defendant INATrust, fsb.

---

## I.    Introduction

This matter is before the Court on motions to dismiss by Defendant

INATrust, fsb [Docket No. 16], and by Defendants Southwest Reinsure, Inc.,

("SRI"), Ideal Insurance Company, and James B. Smith (collectively, the "SRI

Defendants") [Docket No. 33].  The Court heard oral argument on Friday,

October 7, 2011.

## II.   Background

This case arises out of a series of reinsurance contracts and other

agreements between Security Life, a Minnesota insurance company, and the

various defendants.  Security Life's complaint alleges the following facts:

Defendant SRI is a New Mexico company run by Smith, who is the

majority shareholder, President, and CEO.  SRI specializes in establishing

offshore reinsurance companies incorporated in the Turks and Caicos Islands

and therefore subject to lower capitalization requirements than companies based

in the United States.  (Compl. ¶¶ 13-14.)  These offshore companies are referred to

as "producer-owned reinsurance companies" or "PORCs."  (Id. ¶ 16.)

Defendants Family Heritage Reinsurance Co. ("Family Heritage"), Ideal

Insurance Co. ("Ideal"), Sierra Family Life Reinsurance Co. ("Sierra"), and Libre

2

Insurance Co. ("Libre"), are PORCs incorporated in the Turks and Caicos Islands, organized and administered by SRI.  (Id.)

In June 1994, Security Life entered into a reinsurance agreement with Family Heritage (the "1994 Reinsurance Agreement").  (Id., Ex. B.)  Family Heritage agreed to provide reinsurance to cover a portion of Security Life's exposure to claims and losses that it might incur in connection with certain individual life insurance policies.  In exchange, Security Life would pay Family Heritage a share of the premiums that it received on the policies.  In an agreement dated September 9, 1999, Security Life and Family Heritage signed another reinsurance agreement which was effective August 15, 1997 (the "1997 Family Heritage Agreement").  (Id., Ex. C.)

Security Life entered into a third reinsurance agreement with Sierra in September 1997 (the "1997 Sierra Agreement").  (Id., Ex. D.)  This agreement, similar in form to the earlier two reinsurance contracts with Family Heritage, ceded liability from Security Life to Sierra in exchange for a share of the premiums received by Security Life on the reinsured policies.  This agreement was also effective August 15, 1997.

At the same time that the 1994 Reinsurance Agreement was signed, Security Life and SRI entered into an Insurance Administration Agreement ("Administration Agreement"), in which SRI agreed to "provide the services necessary to accomplish the administration of the insurance covered by [the] Agreement." (Id., Ex. E.) SRI's duties under the Administration Agreement were comprehensive and included reviewing application for insurance, preparing and mailing bills to policy holders, receiving and paying claims, and regularly reporting to Security Life.

From Security Life's perspective, SRI treated the 1994 Reinsurance Agreement, the 1997 Family Heritage Agreement, and the 1997 Sierra Agreement (collectively, the "Reinsurance Agreements") as a single program under the Administration Agreement, and SRI made all decisions about the allocation of policies between the Reinsurance Agreements. Security Life alleges that it never communicated directly with Family Heritage or Sierra about the Reinsurance Agreements. (Id. ¶ 19.) Rather, all information that Security Life received about the Reinsurance Agreements was communicated by and through SRI. (Id. ¶ 19.) Security Life believed that SRI or its affiliates owned and controlled all of the "PORCs" involved with the Reinsurance Agreements. (Id. ¶¶ 43-44.)

4

To provide security for the liabilities incurred by Family Heritage, Security Life, and Family Heritage entered into a Funds Withheld and Investments Management Agreement.  (Id., Ex. C.)  Family Heritage agreed that Security Life would place in a "Funds Withheld Account" an amount equal to the Required Reserves, as defined by the Reinsurance Agreements, from amounts otherwise due to Family Heritage.  (Id. ¶ 40.)  Although, on its face, the Funds Withheld and Investments Management Agreement involved only the 1997 Family Heritage Reinsurance Agreement, Security Life placed funds relating to all the Reinsurance Agreements in the Funds Withheld Account without distinction. (Id. ¶ 41-44.)  Under Article X of the 1997 Reinsurance Agreement, if the Funds Withheld Account did not contain the amount required under the reinsurance agreements, the reinsurer "shall pay [Security Life] a fee equal" to the amount needed make any deficiency.  (Id., Ex. C.)

In 1999, Security Life notified Family Heritage, through SRI, that the amount of the Funds Withheld Account was insufficient.  (Id. ¶ 49-50.)  SRI arranged for Libre, another PORC apparently under its control, to provide a letter of credit in lieu of the fee called for in Article X.   (Id. ¶ 51.)  In exchange for

the line of credit, which was renewed for several years, Security Life paid a quarterly fee.  (<u>Id.</u> ¶ 52.)

In 2005, at SRI's suggestion, the letter of credit was replaced by a trust account at INA.  (<u>Id</u>. ¶ 53-55.)  Because Family Heritage did not have sufficient funds to fund the trust, another SRI PORC, Ideal, funded the trust account as the grantor .  (<u>Id.</u> ¶ 55.)  In the trust agreement (the "2005 Trust Agreement") (<u>Id.</u>, Ex. F), Ideal agreed to place sufficient funds to secure payment up to $1,000,000 in reinsured claims and expenses due from Family Heritage.  INA served as the trustee and was to hold the trust's assets "for the sole use and benefit of" Security Life, the beneficiary.  (<u>Id.</u>, Ex. F § 1(a).)  The 2005 Trust Agreement contained several other provisions giving Security Life control over the disposition of the trust and requiring INA to keep Security Life informed about activity relating to the trust.  (<u>Id.</u> ¶ 62.)  Although the 2005 Trust Agreement replaced the letters of credit in 2005, Security Life alleges that SRI continued to bill Security Life a quarterly amount of $20,000 for the letters of credit until 2011. (<u>Id.</u> ¶ 66.)

Security Life received account statements for the INA trust account until April 2006; Security Life then contacted INA to inquire why the statements had

stopped.  (Id. ¶ 67-68.)  INA informed Security Life that the trust account had

been closed since June 2006 and that it had been one of a number of accounts

transferred to Fifth Third Bank ("Fifth Third").  (Id. ¶ 68.)  When Security Life

contacted SRI about this change, SRI confirmed that the fund had been

transferred to Fifth Third and stated that it would send monthly statements from

Fifth Third to Security Life.  (Id. ¶ 70-71.)  Security Life began to receive such

statements in November 2006.  (Id.)  Security Life believed that Fifth Third was a

successor trustee to INA under the 2005 Trust Agreement and that Security Life

continued to be the beneficiary of the trust.  (Id.)  Security Life received Fifth

Third statements from SRI until April 2006, at which time the value of the assets

in the trust account was over $1.1 million.  (Id. ¶ 73.)

In March 2011, Security Life became concerned that the assets held by Fifth

Third were not being held for its benefit and, for that reason, Security Life

contacted Fifth Third.  (Id. ¶ 75-76.)  Fifth Third declined to release information

to Security Life because Security Life was not named on the account.  (Id.)  When

Security Life did gain authority to inquire about the account from SRI, it found

that the assets in the Fifth Third account had originated from the INA trust

account, but the Fifth Third account was subject to a new trust agreement to

which Security Life was not a party (the "2006 Trust Agreement").  (<u>Id.</u> Ex. G.)

The 2006 Trust Agreement names Ideal as the grantor, Fifth Third as trustee, and

an SRI affiliated company, First Automotive Risk Retention Group ("First

Automotive"), as the beneficiary.  (<u>Id.</u> ¶ 80.)  Smith, President and CEO of SRI,

signed the 2006 Trust Agreement as President of <u>both</u> Ideal and First

Automotive.  (<u>Id.</u> ¶ 81.)

Security Life then confronted SRI about its removal as beneficiary of the

trust funds.  In response, SRI acknowledged that a mistake had been made and

assured Security Life that the issue would be corrected quickly.  (<u>Id.</u> ¶ 82.)  On

March 17, 2011, Security Life sent a letter to Fifth Third, advising Fifth Third of

the error and requesting that Fifth Third not make any distributions or changes

to the trust account without Security Life's consent.  (<u>Id.</u> ¶ 84.)  Two weeks later,

Security Life again requested that Fifth Third freeze any distributions or

withdrawals from the account until Security Life was able to correct the trust

agreement governing the account.  (<u>Id.</u> ¶ 85.)

On April 1, 2011, Fifth Third notified Security Life that a distribution

request had been made on the account and that all of the assets held in the trust

account had been distributed, apparently to an SRI affiliated company.  (<u>Id.</u> ¶

87.) As of February 28, 2011—the last time that Security Life received a statement on the Fifth Third trust account—the account was valued at $1,276,767.  (Id. ¶ 86.) As a result of the distribution, Security Life was not able to use the account to meet its statutory capital requirements.  (Id. ¶ 88.)

Security Life has now brought this suit against SRI, the various PORCs that it alleges are affiliated with SRI, and INA.  It has also named John Doe defendants and "ABC" and "XYZ" corporations, to stand in for unknown defendants who may be the successors to the entities involved with the various reinsurance and trust agreements.

Count I of Security Life's complaint seeks to pierce the corporate veil with respect to SRI and the various PORCs.  Count II seeks a declaratory judgment that the PORCs are alters egos of one another and SRI.  Security Life also brings claims for breach of the Reinsurance Agreements (Count III); breach of the 2005 Trust Agreement (Count IV); breach of the Administration Agreement (Count V); breach of fiduciary duties (Count VI); breach of the duty of good faith and fair dealing (Count VII); fraud (Count VIII); conversion (Count IX); and unjust enrichment (Count X).  Finally, Security Life seeks the imposition of a Constructive Trust (Count XI) on the assets of the SRI defendants in the full

9

amount of the balance of the Fifth Third trust account and an injunction (Count

XII) requiring the SRI Defendants to cooperate with Security Life in terminating

the reinsurance agreements.

## III.   Discussion

### A. INA's Motion to Dismiss

Defendant INATrust, fsb ("INA") was trustee of the 2005 Trust Agreement

in which Security Life was the beneficiary and Ideal was the grantor.  A trust

account was established and maintained at INA, but funds from the account

were apparently transferred without Security Life's knowledge to Fifth Third

when the 2006 Trust Agreement went into effect.  Two of the twelve counts in

Security Life's complaint—breach of the 2005 Trust Agreement (Count IV) and

breach of the duty of good faith and fair dealing (Count VII)—are directed at

INA.  INA has moved to dismiss the claims against it, arguing that it lacks

capacity to be sued and that it was not properly served.

### 1.  Capacity to be Sued

Under Rule 17(b)(2), a corporation's capacity to sue or be sued is

determined "by the law under which it was organized."  Although INA styles its

motion as "pursuant to Rules 12(1), (2) and (6)," a motion to dismiss for lack of

capacity to be sued under Rule 17(b)(2) is generally brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See, e.g., Brown v. Fifth Judicial Dist. Drug Task Force, 255 F.3d 475, 476 (8th Cir. 2001).

Under Rule 12(b)(6), the Court will grant a motion to dismiss if the non-moving party has failed to state a claim upon which relief may be granted.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (citations and quotations omitted).  In deciding whether the plaintiff has sufficiently stated a claim, the Court may consider "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." PureChoice, Inc. v. Macke, Civil No. 07-1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)).

INA was a federally chartered savings bank or "association" organized under the Home Owners Loan Act of 1933, 12 U.S.C. § 1464 et seq.  Under 12

C.F.R. § 546.4, such an association "may propose a plan for dissolution,"

providing for either:

> (a) Appointment of the Federal Deposit Insurance Corporation (under section 5 of the Act and section 11 of the Federal Deposit Insurance Act, as amended or section 21A of the Federal Home Loan Bank Act, as amended) as receiver for the purpose of liquidation;

> (b) Transfer of all the association's assets to another association or home-financing institutions under Federal or State charter either for cash sufficient to pay all obligations of the association and retire all outstanding accounts or in exchange for that association's payment of all the association's outstanding obligations and issuance of share accounts or other evidence of interest to the association's members on a pro rata basis; or

> (c) Dissolution in a manner proposed by the directors which they consider best for all concerned.

INA has submitted affidavits and other documentation indicating that the Office

of Thrift Supervision approved its application for voluntary dissolution in 2006

and that INA was dissolved effective March 31, 2008.  (Stalker Aff. ¶ 4-5.)  This

information appears to be confirmed by public records kept by the Federal

Deposit Insurance Corporation (FDIC).  (Rush Decl., Ex. 2.)

INA's counsel has argued that INA no longer has the capacity to sue or be

sued because the statutes and regulations governing federally chartered savings

banks do not provide for an extension of the life of a dissolved bank for the

purposes of litigation.  See <u>Asociacion de Empleados del Area Canalera</u>

<u>(ASEDAC) v. Panama Canal Com'n</u>, 453 F.3d 1309, 1313 (11th Cir. 2006) ("When

a corporation dissolves, all pending suits by or against it abate, and no valid

judgment may be rendered for it or against it, unless there is statutory authority

extending the life of the corporation for litigation purposes.")

In response, Security Life argues that language in 12 C.F.R. § 546.3

indicates that a federally chartered savings bank or its successors may be sued

after dissolution.  That section concerns the "[t]ransfer of assets upon merger or

consolidation" and states that "[a]ll rights and obligations of the disappearing

institutions shall remain unimpaired, and the resulting institution shall . . .

succeed to all those rights and obligations."  12 C.F.R. § 546.3.

At this early stage in the litigation it is not clear how or to where INA's

assets were transferred upon its resolution.  Further discovery will shed light on

those issues and, therefore, the Court concludes that dismissal for lack of

capacity to be sued is not warranted at this time.

### 2.   Service of Process

If a plaintiff fails to sufficiently serve process on a defendant, the Court

lacks jurisdiction over that defendant, <u>Printed Media Servs, Inc. v. Solna Web,</u>

Inc., 11 F.3d 838, 843 (8th Cir. 1993), and the defendant may move for dismissal under Rule 12(b)(2) and 12(b)(5).   While a plaintiff eventually bears the burden of establishing personal jurisdiction and sufficient service of process by preponderance of the evidence, only a prima facie showing is required at this stage.  Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995).  "[T]he court must look at the facts in the light most favorable to the nonmoving party . . . and resolve all factual conflicts in favor of that party."  Dakota Indus. v. Dakota Sportswear, 946 F.2d 1384, 1387 (8th Cir. 1991) (citations omitted).

Service of process is sufficient when it is made (1) pursuant to the law of the state in which the district is located, (2) by personal service to the individual, the individual's dwelling, or the authorized agent, or (3) when it is waived by the defendant.  Fed. R. Civ. P. 4(d), (e).  Under Minnesota law, actual notice is not sufficient to subject a defendant to the Court's jurisdiction absent substantial compliance with service of process rules.  See, e.g., Thiele v. Stich, 425 N.W.2d 580, 584 (Minn. 1988).

Process servers hired by Security Life attempted to serve INA at numerous addresses, including at INA's last known business address and at other

addresses associated with businesses which Security Life believed might be

connected with INA.  (Borer Aff. ¶¶ 2-7.)  After several failed attempts, Security

Life's counsel was notified that the documents had been successfully served to

Scott Lascala at CT Corp, who was identified as the service of process agent for

INA.  (Id.)  INA argues that service to CT Corp was improper because CT Corp is

the registered agent for INA Holdings, Corp., not for INATrust, fsb.  (Pierro Aff.

¶ 6-8.)  INA <u>Holdings</u> is not a party in this case.

Viewing the evidence in the light most favorable to Security Life, the Court

concludes that Security Life has made the requisite prima facie showing.  <u>See</u>

<u>Dakota Indus.</u>, 946 F.2d at 1387; <u>Northrup King Co.</u>, 51 F.3d at 1387.  Security

Life will still, of course, need to establish this Court's jurisdiction by a

preponderance of the evidence before trial.

### B.  The SRI Defendants' Motion to Dismiss

Southwest Reinsure, Inc. ("SRI"), Ideal Insurance Company, Ltd. ("Ideal"),

and James B. Smith (collectively, "the SRI Defendants") have moved to dismiss

five of the counts in Security Life's complaint for failure to state a claim under

Rule 12(b)(6).  As discussed above, to survive a motion to dismiss, Security Life's

complaint "must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." <u>Zutz</u>, 601 F.3d at 848.  While the

"complaint need not include detailed factual allegations," Security Life is obliged

to provide more than "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action."  <u>Id.</u>

### 1.    Count III—Breach of Reinsurance Agreements

Security Life alleges that the SRI Defendants' breached the reinsurance

agreements through their:  "(a) Failure to provide sufficient security to avoid a

deficiency in reserves required for the Insurance Program; (b) Failure to pay

amounts due to Security Life under the Reinsurance Agreements; (c) Failure to

timely and accurately report on the reserves for the policies included in the

Insurance Program; (d) Refusing Security Life's demands for the establishment of

reserves sufficient to cover liabilities for the ceded portion of the Insurance

Program; and (e) Failure to inform Security Life of the insolvency, termination or

inability to perform of Family Heritage and other SRI Defendant entities."

(Compl. ¶ 104.)

Under Minnesota and New Mexico law—the two potential sources of law

for this claim—the elements for breach of contract are:  (1) the existence of a valid

contract; (2) material breach of the contract; and (3) damages.  <u>Briggs Transp. Co.</u>

v. Ranzenberger, 217 N.W.2d 198, 200 (Minn. 1974); Camino Real Mobile Home

Park P'ship v. Wolfe, 891 P.2d 1190, 1196 (N.M. 1995).

### a.  Failure to provide sufficient security

The 1997 Reinsurance Agreement states: "If the funds withheld do not

equal the amount of the Required Reserves, the ceding company [Security Life]

may charge a fee as provided for in Article X, or terminate the agreement as

provided for in Article XVI."  (Compl., Ex. C, Art. IX.)  The SRI Defendants argue

that, under this provision, Security Life had only two options for responding to a

deficiency in the required reserves:  Security Life could have charged a fee to the

reinsurers or terminated the agreement.  Security Life has not alleged that it

attempted to take either action in reaction to a deficiency in the reserves.  Since

the reinsurers have never been asked to pay a fee or refused to do so, the SRI

Defendants contend that there could not have been a breach.

Security Life responds that the parties' course of dealing modified the

terms of the 1997 Reinsurance Agreement.  In particular Security Life notes that

when it approached SRI about a deficiency in the reserves, SRI itself proposed

that the deficiency be satisfied through the provision of a letters of credit.

Security Life further notes that it was SRI's suggestion to replace the letters of

credit with the 2005 Trust Agreement.  In Security Life's view, these alternate

provisions of security effectively modified the agreement and the SRI Defendants

breached the agreement as modified.

The SRI Defendants acknowledge that modification of a contract is

possible through mutual consent but argue that the Reinsurance Agreements

were not so modified.  They note that Family Heritage and Sierra were not

parties to the 2005 Trust Agreement, that Ideal, the grantor in the 2005 Trust

Agreement, was not a party to the Reinsurance Agreements, and that Ideal was

never added to those agreements.  Clark v. Otto B. Ashbach & Sons, Inc., 64

N.W.2d 517, 522 (Minn. 1954) (guarantor is not party to principal obligation and

debtor's undertaking is "independent" of guarantor's).

The SRI Defendants' arguments run up against Security Life's allegation

that SRI, Ideal, and the various reinsurers are alter egos.  Assuming that this

plausible allegation is true, the argument that the entities which entered into the

Reinsurance Agreements were different from those which entered the 2005 Trust

Agreement loses its force.  Of course, more facts may later be developed which

defeat Security Life's alter ego theory and modification allegations.

The SRI Defendants further argue that Security Life has inadequately alleged damages caused by any parties' alleged failure to provide funds or establish reserves.  The SRI Defendants focus on language in Security Life's complaint stating that the decline in its statutory capital "may result in adverse regulatory action and may have a deleterious impact on Security Life's A.M. Best rating."  (Compl. ¶ 88 (emphasis added).)  The SRI Defendants argue that these potential consequences are too speculative to support a cause of action.  See Leoni v. Bemis Co., Inc., 255 N.W.2d 824, 826 (Minn. 1977).

Security Life responds that its complaint contains more than mere speculation about damages.  As a result of the trust's dissolution, Security Life alleges that it could no longer claim the same level of security for its outstanding liabilities—its "statutory capital and surplus suffered an immediate decline of at least $1,275,715."  (Compl. ¶ 88.)  Such a loss has very real consequences for an insurance company.

The Court concludes that Security Life's complaint provides sufficiently plausible factual allegations of damages that are not so "speculative, remote, or conjectural" as to bar recovery.  Leoni, 255 N.W.2d at 826.

### b.  Failure to pay amounts due to Security Life

The SRI Defendants further dispute the claim that they "fail[ed] to pay amounts due to Security Life" under the Reinsurance Agreements.  They argue that any amounts due under the Reinsurance Agreements were to be deducted from reinsurance premiums before any payments were transferred to the reinsurers and that Security Life has not alleged that it failed to make such deductions.  Security Life responds that the "reporting between and among [the] parties was extremely complex" and, for that reason, it should be "entitled to complete discovery and an accounting of the program to determine the full extent of its losses."

At this limited stage of factual development, the Court cannot conclude that Security has failed to state a claim with respect to amounts due under the Reinsurance Agreements.

### c.  Failure to notify Security Life of insolvency or termination of reinsurers

The SRI Defendants' contend that the allegation that they failed to notify Security Life of the insolvency of certain reinsurers—Family Heritage, Sierra Family, Libre, and Ideal—amounts to an allegation of a legal conclusion (insolvency) which has not been supported by alleged facts.  They cite to a

number of cases which stand for the proposition that a bare allegation of insolvency is not sufficient to survive a motion to dismiss.  See, e.g., In re USDigital, Inc., 443 B.R. 22, 39 (Bkrtcy. D. Del. 2011).

The Court notes, however, that Security Life has alleged that SRI itself informed Security Life in 2010 that Heritage Life had "terminated" in 2006. (Compl. ¶ 47.)  This alleged admission by SRI elevates Security Life's claim above a bare allegation of insolvency.  Other alleged facts, including the SRI Defendants' continual restructuring of the various agreements, also indicate that one or more of the reinsurance companies were incapable of meeting their obligations.

While some of the bases for Security Life's breach of contract claim may be weaker than others and may not be viable after further factual development, the Court concludes that Security Life's claim based on the SRI Defendants' breach of the Reinsurance Agreements is sufficiently supported by plausible factual allegations to survive a motion to dismiss.

### 2.   Count VI—Breach of Fiduciary Duty

The parties dispute whether Security Life has pled facts sufficient to show that the SRI Defendants owed it a fiduciary duty.  The elements of breach of

fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) breach of that duty; (3) causation; and (4) damages.  See Conwed Corp. v. Employers Reinsurance Corp., 816 F. Supp. 1360, 1362 n.3 (D. Minn. 1993).

While "the existence of a legal duty is [generally] an issue for the court to determine as a matter of law," Larson v. Larson, 373 N.W.2d 287, 289 (Minn. 1985), "the existence of a fiduciary relationship is a question of fact," Murphy v. Country House, Inc., 240 N.W.2d 507, 512 (Minn. 1976) (emphasis added).  A fiduciary duty may arise where one party "knows or has reason to know" that the other party is placing its trust and confidence in it and is relying on it for counsel and information, Klein v. First Edina Nat. Bank, 196 N.W.2d 619, 623 (Minn. 1972), but such a relationship is not typically formed by two parties dealing at arm's length, Shema v. Thorpe Bros., 62 N.W.2d 86, 91 (Minn. 1954).

Security Life claims that the SRI Defendants owed it fiduciary duties because Security Life "trusted and confided in [them]."  (Compl. ¶ 121.)  Security Life further claims that SRI owed it a fiduciary duty under the Administration Agreement, that the various SRI PORCs owed it a fiduciary duty under the Reinsurance Agreements, and that Ideal owed it a fiduciary duty under the 2005 Trust Agreement.  (Id. ¶ 122-24.)

### a. Duties under the Reinsurance Agreements and the Administration Agreement

The SRI Defendants argue that the Reinsurance Agreements do not create any fiduciary duties. They points to several cases in which courts have held that arm's length reinsurance agreements between sophisticated insurance companies do not create fiduciary duties. See, e.g., North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d 1194, 1212 (3d Cir. 1995); Christiana Gen. Ins. Co. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992). The SRI Defendants contend that the Reinsurance Agreements at issue here should receive the same treatment.

As Security Life points out, however, the cases cited by the SRI Defendants, including North River and Christiana, were concerned with the question of whether a reinsured party owes a fiduciary duty to a reinsurer, not vice versa. Moreover, the complex relationships between and among Security Life, SRI, and the reinsurers call into to question the arm's length nature of the various agreements between the parties. The cases cited by the SRI Defendants do not concern a situation where, as here, the same entity allegedly served as both an administrator and as a reinsurer in the same reinsurance plan. The alleged circumstances surrounding the relationships between the parties in this

case give rise to live factual issues as to the existence of fiduciary duties under the Reinsurance Agreements.

### b. Duties under the Administration Agreement

While the SRI Defendants acknowledge the Administration Agreement gave SRI some express fiduciary duties, they argue that Security Life has not alleged breach of any of those duties.  Under the Administration Agreement, SRI is required to hold premiums and premium refunds in an account "in a fiduciary capacity until disbursement is required."  (Compl., Ex. E § 2(e).)   SRI is also required to put money in a "Claims Account" which is described as a "fiduciary account."  (Id. § 2(G).)  Security Life has not alleged that either of those duties was breached by SRI.

As discussed above, Security Life has alleged that SRI took on a broader role than that set out in the Administration Agreement, becoming the exclusive provider of information to Security Life, providing security through affiliated companies when reserves were deficient, communicating with the PORCs on Security Life's behalf, and otherwise leading "Security Life to believe that it was acting in Security Life's best interest."  In these ways, what may not have originally been a fiduciary relationship was transformed into one as Security Life

placed its trust and confidence in SRI.  This issue cannot be solved without further factual development.

### c.  Duties under the 2005 Trust Agreement

The 2005 Trust Agreement is expressly governed by Ohio Law.  (Compl., Ex. F at 8.)  Under Ohio law, while the trustee (INA) has a fiduciary duty to the beneficiary of a trust (Security Life), the grantor (Ideal) does not have such a duty.  See, e.g., In re Arctic Express, Inc., 636 F.3d 781, 792 (6th Cir. 2011). Security Life has not responded to the argument that Ideal, the only SRI Defendant named in the 2005 Trust Agreement, does not owe a fiduciary duty to Security Life under that agreement.  The Court concludes that, as a matter of law, the language of the 2005 Trust Agreement cannot serve as a basis for finding a fiduciary duty owed to Security Life by Ideal.

The Court concludes that Security Life has otherwise pled plausible facts in support of its assertion that the SRI Defendants owed it fiduciary duties under the Reinsurance Agreements and the Administration Agreement.  A further analysis of such duties will require a fact-bound analysis informed by discovery in this case.

### 3.    Count VIII—Fraud

Security Life alleges that the SRI Defendants committed fraud by: (1) failing to disclose that they had arranged for the transfer of assets out of the INA trust account; (2) eliminating Security Trust as the beneficiary of the trust assets without notification; (3) concealing the transfer of the trust funds by representing to Security Life that the funds were still being held in trust for the benefit of Security Life and sending Security Life statements for the Fifth Third trust account from late 2006 to early 2011; (4) representing in March 2011 that the funds in the Fifth Third trust account were still being held for the benefit of Security Life; (5) directing that the funds in the Fifth Third trust account be disbursed; and (6) submitting fraudulent bills to Security Life continuously from April 2005 through January 2011 for fees on letter of credit which was no longer in effect.  (Compl. ¶ 133.)

The SRI Defendants argue that Security Life's fraud claim lacks particularity and also fails to state a claim.

### a.  Particularity of the Fraud Claims

Plaintiffs must plead allegations of fraud with particularity.  Fed R. Civ. P. 9(b).  A pleading which alleges fraud or mistake must identify "who, what,

where, when and how." <u>Bank of Montreal v. Avalon Capital Group, Inc.</u>, 743 F.

Supp. 2d 1021, 1028 (D. Minn. 2010) (quoting <u>Parnes v. Gateway 2000, Inc.</u>, 122

F.3d 539, 550 (8th Cir. 1997)).  The facts alleged must "give Defendants notice of

what conduct is complained of and to prepare a defense to such claim of

misconduct." <u>First Presbyterian Church of Mankato, Minn. v. John G. Kinnard &</u>

<u>Co.</u>, 881 F. Supp. 441, 445 (D. Minn. 1995) (citation omitted).

The SRI Defendants argue first that Security Life did not plead the "who"

of its fraud claim with particularity.  They note that at one point in its Complaint,

Security Life states that "Smith and the other SRI Defendants made false

representations" without differentiating between the various defendants or

identifying a particular speaker.  (Compl. ¶ 133.)  This Court rejected similar

language in <u>Bank of Montreal</u>.

The Court notes, however, that Security Life's Complaint identifies

particular speakers at other points, making clear that it claims that the alleged

fraudulent statements were made by Defendant Smith and employees of

Defendant SRI.  With respect to the transfer of trust assets from INA to Fifth

Third, for example, the Complaint alleges that SRI led Security Life to believe

that Security continued to be the beneficiary of the trust even when another

beneficiary had been named, by omitting that crucial information from its communications and by continuing to send Security Life account statements even when Security Life was no longer the beneficiary of the funds.  (Id. ¶¶ 71-72.)  Security Life further alleges that SRI in particular continued to send bills for quarterly letter of credit fees for years after the letters of credit were no longer in place.  (Id. ¶ 133(f).)  These references to particular defendants satisfy the "who" requirement for the fraud claim.

The SRI Defendants also argue that the Security Life's fraud claim lacks particularity with respect to the time, place, and content of alleged false representations.  They complain that Security Life has not set out the specific dates on which SRI allegedly made false representations about the status of the trust assets which Security Life believed were being held for its benefit.  The SRI Defendants also argue that Security Life has not provided detail about an alleged March 2011 meeting in which SRI acknowledged that a mistake had been made and committed to correcting it.

Many of the details that the SRI Defendants seek are contained in the fact section of Security Life's Complaint.  To begin, Security Life has alleged that SRI billed Security Life on a quarterly basis for letters of credit that no longer existed.

Security Life has also alleged that, by continuing to forward the Fifth Third trust

account statements, SRI led Security Life to believe that the funds in the account

were still being held for its benefit, when they were not.  Moreover, the

Complaint's fact section contains a more detailed description of the March 15,

2011 meeting in which SRI allegedly acknowledged mistakes and pledged to

correct them.  (Id. ¶ 82.)

While some paragraphs of Security Life's Complaint may contain overly

general allegations of misrepresentations similar to those rejected by the Court in

Bank of Montreal, 743 F. Supp. 2d at 1028, the Court concludes that Security Life

has provided sufficient detail to give the SRI Defendants "notice of what conduct

is complained of and to prepare a defense to such claim of misconduct."  First

Presbyterian Church, 881 F. Supp. at 445.

### b.  Sufficiency of the Fraud Claims

Under both Minnesota and New Mexico law, a plaintiff claiming common

law fraud must prove:

> (1) a false representation . . . of a past or existing material fact
> susceptible of knowledge; (2) made with knowledge of the falsity of
> the representation or made without knowing whether it was true or
> false; (3) with the intention to induce [the plaintiff] to act in reliance
> thereon; (4) that the representation caused [the plaintiff] to act in

reliance thereon; and (5) that [the plaintiff] suffered pecuniary damages as a result of the reliance.

Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009); accord

Cain v. Champion Window Co. of Albuquerque, LLC, 164 P.3d 90, 97 (N.M. Ct.

App. 2007).  The plaintiff's reliance on the misrepresentation must have been

reasonable or justified.   Valspar, 764 N.W.2d at 369.  "Whether a party's reliance

is reasonable is ordinarily a fact question for the jury unless the record reflects a

complete failure of proof."  Hoyt Props., Inc. v. Prod. Res. Group, L.L.C., 736

N.W.2d 313, 321 (Minn. 2007).

Security Life has alleged that the SRI Defendants committed fraud both by

failing to disclose important information and by making misrepresentations.

**Failures to disclose.**  While a party to a business transaction has no general

duty to disclose material facts to the other party, a special duty to disclose arises

"where there exists a confidential or fiduciary relationship between the parties;

where disclosure is necessary to clarify information already disclosed, which

would otherwise be misleading; or where the non-disclosing party has special

knowledge of material facts to which the other party does not have access."

Cannon Technologies, Inc. v. Sensus Metering Sys., Inc., 734 F. Supp. 2d 753, 767

(D. Minn. 2010).  "Courts applying Minnesota law have been reluctant to impose

a duty to disclose material facts in arm's-length business transactions between commercial entities." <u>Driscoll v. Standard Hardware, Inc.</u>, 785 N.W.2d 805, 813 (Minn. App. Ct. 2010).

Security Life alleges that the SRI Defendants failed to disclose information about the transfer of trust assets from INA to Fifth Third and the removal of Security Life as beneficiary of the trust. The SRI Defendants argue that they had no general obligation to disclose the information that Security Life alleges that they concealed. First, with respect to the transfer of trust funds from INA to Fifth Third, the SRI Defendants argue that under the Trust Agreement, only the trustee (INA) had a duty to notify Security Life of termination of the trust. Ideal—the grantor and the only SRI party to the 2005 Trust Agreement—had no such duty.

Security Life responds that while the SRI Defendants may not have had an express duty to disclose changes under the 2005 Trust Account Agreement, special circumstances giving rise to a duty to disclose are present here. First, Security Life reiterates its allegation that SRI owed it fiduciary duties. <u>See</u> <u>Cannon Technologies</u>, 734 F. Supp. 2d at 767. Second, Security Life argues that it was necessary for SRI to disclose the changes to the trust account in order to

clarify the information that it had already provided.  Id.  In particular, the

information that SRI did disclose in 2006—that the trust account had been

transferred to a different bank—misled Security Life into believing that the other

aspects of the 2005 Trust Agreement remained unchanged.  Third, Security Life

argues that SRI had "special knowledge of material facts to which [Security Life

did] not have access."  Id.  Several years had elapsed during which only SRI was

aware of the fact that Security Life had been removed as a beneficiary of the

trust, and SRI was Security Life's only source of information about the Fifth

Third trust account during that time.

The Court concludes that these factual allegations, if proven, could

support a finding of special circumstances giving rise to a duty to disclose.

**Affirmative misrepresentations.**  The SRI Defendants argue that Security

Life could not have reasonably relied on their alleged affirmative misstatements.

Absent a "complete failure of proof" a determination of the reasonableness of a

party's reliance is "a fact question for the jury."  Hoyt Props., 736 N.W.2d at 321.

The first alleged affirmative misrepresentation by SRI is a statement in late

2006 to Security Life that the assets that had been transferred from INA to Fifth

Third were still being held in Security Life's benefit.  Security Trust argues that

this statement was meant to conceal SRI's "wrongful transfer of the trust assets

from the INA Trust Account to the Fifth Third Trust Account, and their

fraudulent termination of the 2005 Trust Agreement."  (Compl. ¶ 133(c).)  The

SRI Defendants argue that SRI could not have meant to conceal the transfer when

there is no dispute that SRI itself informed Security Life of the transfer.

As the Court understands it, Security Trust's claim is not that SRI

concealed the transfer itself; rather, Security Trust claims that SRI attempted to

conceal the "wrongful" aspect of the transfer, that is, the elimination of Security

Life as beneficiary of the trust funds.   While the SRI Defendants argue that it was

unreasonable for Security Life to believe any such representation, questions of

reasonableness are generally fact issues for the jury, <u>Hoyt Properties</u>, 736 N.W.2d

at 321, and it is therefore premature to pursue that inquiry at this stage.

A second alleged affirmative misrepresentation by SRI occurred in March

2011, when SRI again stated that the funds in the Fifth Third Trust Account were

being held for Security Life's benefit.  (Compl. ¶ 133(d).)  Security Life has stated

that, as of March 1, 2011, it had suspected that the funds were not being held for

its benefit and that it confirmed that suspicion by at least March 15, 2011.

(Compl. ¶¶ 75-79.)  SRI argues that Security Life could not have reasonably

relied on any representations in March 2011 "regarding how the Fifth Third trust

assets were held because it allegedly discovered the alleged actual state of affairs

that same month." Security Life responds that the question of what happened in

March 2011 raises fact issues which cannot resolved before discovery.

The Court notes that Security Life may have a plausible fraud claim even if

reasonably relied on SRI's alleged misrepresentation for only a matter of days.

As for the reasonableness of any reliance on SRI's statement in March 2011, as

above, that question is generally reserved for the jury "unless there is a complete

failure of proof." Hoyt Properties, 736 N.W.2d at 321. The SRI Defendants'

similar argument that Security Life could not have reasonably relied on bills for

letters of credit which Security Life knew where no longer in place fails at this

stage for the same reason. (Compl. ¶ 53-56, 65, 133(f).) For these reasons, the

Court must reject SRI Defendants' motion to dismiss Security Life's fraud claim.

### 4.    Count IX—Conversion

Security Life claims that the SRI Defendants committed conversion by

transferring trust assets from the INA trust account to the Fifth Third trust

account, later directing that the assets be distributed out of the Fifth Third trust

account, and thereby depriving Security Life of its interest in the assets. Under

Minnesota, New Mexico, and Ohio law, "[t]he elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest." Noble Sys. Corp. v. Alorica Central, LLC, 543 F.3d 978, 986 (8th Cir. 2008) (applying Minnesota law); see also Nosker v. Trinity Land Co., 757 P.2d 803, 807-08 (N.M. Ct. App. 1988); Ubanek v. All State Home Mortgage Co., 898 N.E. 2d 1015, 1021 (Ohio Ct. App. 2008). To bring a successful conversion claim, the plaintiff must show that it had an "enforceable interest in the subject property." Noble Sys., 545 F.3d at 986. That is, the plaintiff must have been "entitled to immediate possession of the [property]" at issue. Restatement (Second) of Torts § 225 (1965); Nosker, 757 P.2d at 807-08; Ubanek, 898 N.E. 2d at 1021.

The 2005 Trust Agreement specifies that Security Life, as the sole beneficiary of the agreement, "shall have the right, at any time and from time to time, to withdraw from the Trust Account, upon written notice to the Trustee." (Compl., Ex. F § 2(a).). The agreement further provides:

> [Security Life] shall use and apply any withdrawn Assets . . . for the following purposes only: to pay or reimburse [Security Life] for Family Heritage's share under the Reinsurance Agreement . . . provided, however, that such withdrawal shall not be made unless and until the funds held by [Security Life] under the Funds Withheld Agreement are depleted though the payment of claims,

35

expenses, unearned premiums refunds, and surrender benefits reinsured under the Reinsurance Agreement.

(Id. § 3(a) (emphasis added).)  The SRI Defendants argue that since Security Life has not alleged that the assets held under the Funds Withheld Agreement were depleted, it never had an immediate right to access the trust funds.

In support, the SRI Defendants cite Gillespie v. Seymour, 796 P.2d 1060 (Kan. Ct. App. 1990).  In Gillespie, a panel of the Kansas Court of Appeals held that beneficiaries of a trust could not bring a claim of conversion of the trust assets because, while "they possessed a future in interest in the trust," they "had no right to immediate possession of the trust funds."  Id. at 1066.

As Security Life points out, however, Gillespie is not binding on this court and it is distinguishable from the facts in this case.  The language in the 2005 Trust Agreement giving Security Life the right to withdraw funds "at any time" clarifies that Security Life had a current interest in the trust funds.  Moreover, the assets at issue in Gillespie did not serve as security.  Here, the parties agreed that the 2005 Trust Agreement would serve as security, replacing the letters of credit. Finally, the trust agreement in Gillespie expressly stated that the beneficiaries had no "title to or interests in" the trust funds until the funds were "actually received in possession" by the beneficiaries.  Gillespie, 796 P.2d at 1066.  The

question presented Gillespie, therefore, was whether a conversion claim could proceed where the plaintiff had no legal interest in the allegedly converted funds.  The 2005 Trust Agreement does not rule out Security Life's interest in the trust funds; instead, it places conditions on the exercise of that interest.

Neither party has presented case law addressing whether a conversion claim may be brought where, as here, the plaintiff can claim only a contingent interest in property.  The Court concludes, however, that such a claim conflicts with the principle the plaintiff must be "entitled to immediate possession" of the property in question.  See Nosker, 757 P.2d at 807-08; Ubanek, 898 N.E.2d at 1021; see also Restatement (Second) of Torts § 225 (1965).

While the facts alleged in the Complaint indicate that Security Life had a current interest in the funds being held for its benefit, they do not indicate that Security Life had immediate right to possess those funds.  Withdrawals were permitted only upon depletion of the funds held under the Funds Withheld Agreement, a circumstance that SRI has not alleged.  Security Life's right to withdraw funds was never "enforceable" because the condition precedent to such withdrawal did not occur.  See Noble Sys., 543 F.3d at 988.  Without more, Security Life's conversion claim fails as a matter of law.

### 5.    Count XII—Mandatory Injunction

"The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits."  <u>Bank One, Utah v. Guttau</u>, 190 F.3d 844, 847 (8th Cir. 1999).  Moreover, under Rule 65(d) of the Federal Rules of Civil Procedure, an "order granting an injunction . . . must . . . state its terms specifically [and] describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  A party seeking an injunction must therefore explain its request with sufficient specificity.

In Count XII of its Complaint, Security Life had requested that the Court provide injunctive relief by requiring the SRI Defendants to cooperate with the termination of the Administration Agreement and the Reinsurance Agreements. Security Life now acknowledges that, since "it has determined not to terminate the Administration Agreement or the Reinsurance Agreements at this time," injunctive relief relative to the termination of those agreements is "unnecessary."

Security Life nonetheless urges that Count XII should not be dismissed but should instead be "limited to injunctive relief necessary to remedy the harm

caused by Defendants as alleged in the Verified Complaint."  Apart from this

general request for injunctive relief, however, Security Life has not explained

what such injunctive relief would entail or what particular injury it might

address.  As a result, Security Life's request does not meet the Rule 65(d)'s

specificity requirements and dismissal is warranted.


Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1) Defendant INATrust, fsb's Motion to Dismiss [Docket No. 16] is **DENIED.**

2) Defendants Southwest Reinsure, Inc., Ideal Insurance Company, and James B. Smith's Motion to Dismiss [Docket No. 33] is **GRANTED IN PART** and **DENIED IN PART** as follows:

> Counts III (breach of the Reinsurance Agreements), VI (breach of fiduciary duty), and VIII (fraud) **REMAIN,** Count IX (conversion) is **DISMISSED** with prejudice, and Count XII (mandatory injunction) is **DISMISSED** without prejudice.


Dated:   December 20, 2011          s/ Michael J. Davis_____
                                                 Michael J. Davis
                                                 Chief Judge
                                                 United States District Court